# Illinois Official Reports

## Appellate Court

---

### *In re Jennifer W.*, 2014 IL App (1st) 140984

---

| | |
|---|---|
| Appellate Court Caption | *In re* JENNIFER W. and JOSHUA W., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Ann W., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-0984 |
| Filed | September 19, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the trial court's dispositional order with respect to respondent mother's two teenaged minor children, the appellate court found that the trial court's findings that respondent was not able to care for the children, that reasonable efforts had been made to prevent or eliminate the need for removal of the children from the home, and that it was in the children's best interests to be made wards of the court were not against the manifest weight of the evidence, especially when the children refused to visit with her and the emotional and psychiatric problems in the household arose from respondent's relationship with the children. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 13-JA-00155, 13-JA-00156; the Hon. Bernard J. Sarley, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Abishi C. Cunningham, Jr., Public Defender, of Chicago (Stephanie Foster, Assistant Public Defender, of counsel), for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Michele Lavin and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People.

Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Christopher Williams, of counsel), guardian *ad litem*.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.


**OPINION**

¶ 1    The instant appeal arises from the juvenile court's entry of a dispositional order finding respondent Ann W. (the children's mother) unable to care for her children, 15-year-old Jennifer W. and 13-year-old Joshua W. Respondent argues that the juvenile court's finding that she was unable to care for her children and its finding that "reasonable efforts had been made to prevent or eliminate the need for removal of the minor[s] from the home" were against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 2                                BACKGROUND

¶ 3    On February 14, 2013, the State filed a petition for adjudication of wardship, asking for Jennifer W. to be adjudicated a ward of the court; the State also filed a motion for temporary custody the same day. The adjudication petition claimed that Jennifer was neglected: (1) in that she was "not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for her well-being, ***, including adequate food, clothing or shelter"; and (2) in that she was a minor under 18 years of age "whose environment [was] injurious to her welfare." The adjudication petition also claimed that Jennifer was abused in that her parent or an immediate family member "[c]reate[d] a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function."

¶ 4    The facts underlying all three claims are the same. The children were living with their father, Randall W., while he and respondent were in the process of obtaining a dissolution of their marriage. Previously, respondent and Randall, her then-husband,[1] had one report

_____

[1]Randall is not a party to the instant appeal. Accordingly, we relate facts concerning Randall only when necessary to our consideration of respondent's appeal.

indicating "substantial risk of harm." On February 11, 2013, the "father informed police personnel that he left this minor and her sibling home alone. Father stated that he is no longer willing or able to care for this minor and her sibling." Respondent's contact with Jennifer and Joshua was limited by a Kane County court order in the divorce proceedings, and there were no relatives willing or able to take care of Jennifer and Joshua.

¶ 5    On the same day, the State filed a petition for adjudication of wardship and motion for temporary custody for Joshua, containing identical allegations to those contained in Jennifer's petition.

¶ 6    Also on February 14, 2013, the Department of Children and Family Services (DCFS) investigator assigned to the children's case filed an "Affidavit Documenting DCFS Efforts," which stated that this case came to the attention of DCFS on February 11, 2013, when Randall voluntarily contacted Hanover Park police at approximately 8 a.m., "stating he had left the kids alone to go to a court date in Kane County and the two children refused to get up or go to school."[2]  The police responded and found Joshua and Jennifer, who were 12 and 13 at the time, respectively, alone at home. Joshua was taken to the Hanover Park police station because he claimed to be ill, while Jennifer was taken to school, where she attended special education classes. The affidavit stated that Joshua had been diagnosed with depression and was on psychotropic medication and that Jennifer had been diagnosed with bipolar disorder. The next day, on February 12, 2013, Jennifer was hospitalized "due to severe aggression and her disorder."

¶ 7    The affidavit stated that respondent and Randall had a prior indicated report for "allegations #60, Substantial risk of Physical injury, Environment injurious to health and welfare by neglect" in a case from 2010 "which was opened for Short Term intact services."[3] The affidavit further stated that respondent had "lost custody of her children per Kane County" as a result of the dissolution of her marriage.

¶ 8    The affidavit listed, as "[t]he specific reasons(s) I have identified that leads DCFS to place or consider placing the child," that "Father is unable and unwilling to care for his child(ren), Mother is also unable at this time to care for her child(ren) based on mental health issues and a court report. Father admitted to CPI that he is unable to manage the behaviors of both children who have special need[s]. All family members located [reported] that they cannot or will not care for the children as they also feel their needs are too extensive to manage."

¶ 9    Based on the facts alleged in the State's petitions for adjudication of wardship, on February 14, 2013, the juvenile court found probable cause that the children were abused or neglected and that immediate and urgent necessity existed to support their removal from the home. The court granted temporary custody to the DCFS guardianship administrator, with the right to place the children and the authority to consent to both ordinary and routine medical care and major medical care on their behalf. The court also entered an order granting respondent supervised day visits, which "shall occur at the discretion of the minors." On

---

[2]The record reveals that, in fact, Randall had no court date that day.

[3]Respondent's name was removed from the State Central Register as an indicated perpetrator of child abuse and neglect in connection with that case after the Illinois Supreme Court found that DCFS did not have the authority to investigate and indicate an allegation based on "environment injurious" in *Julie Q. v. Illinois Department of Children & Family Services*, 2013 IL 113783.

August 7, 2013, another order on visitation was entered, granting respondent supervised day visits, which "shall occur at the discretion of [the] minors in consultation with the children's individual therapist[s]."

¶ 10                                    I. Adjudication of Wardship

¶ 11        On January 21, 2014, at the hearing for adjudication of wardship, the parties stipulated to the following facts: that respondent and Randall are the parents of Jennifer, born on March 1, 1999, and Joshua, born on October 23, 2000, and that during the course of their dissolution of marriage proceedings in Kane County, Randall was awarded sole custody of the children, and respondent had limited visitation rights.

¶ 12        The parties also stipulated that if called to testify, Hanover Park police officer Kathy McClaughry would testify that on February 11, 2013, she responded to a call from Randall and visited his home; Randall was not present and Jennifer and Joshua were home unsupervised. Based on her observations, "it was apparent that Jennifer was not able to care for herself or Joshua." McClaughry observed that Jennifer was "very agitated and unable to carry on a conversation, continually walking away and shouting" and had not taken her morning psychotropic medication, which was left in a spoon on the counter. Joshua informed McClaughry that he was too ill to attend school. McClaughry transported Jennifer to school and transported Joshua to the Hanover Park police station, where he was eventually examined by paramedics. McClaughry called DCFS and advised that she had a juvenile in custody.

¶ 13        McClaughry would testify that the same day, at approximately 12:19 p.m., she spoke to Randall at the Hanover Park police station, where he stated that he was in the process of marriage dissolution proceedings and had been granted physical custody of the children. He "needed to be in court" on February 11, but Jennifer refused to go to school, so "without ensuring his children went to school," Randall left the home. Randall informed McClaughry that "[h]e cannot control the minor children," who had "special needs"; Jennifer had been diagnosed with bipolar disorder and Joshua had been diagnosed with anxiety, depression, and anger disorder. Both children were medicated to treat their disorders. Randall informed McClaughry that "[h]e thinks the state should take custody of [the] Minor children because he is unable to care [for] them due to a brain injury."[4]

¶ 14        The parties also stipulated that if called to testify, LaDonna Woods would testify that she was employed by the DCFS division of child protection and was assigned to investigate an allegation of abuse and neglect of the children on February 11, 2013. That day, she had an in-person conversation with respondent, who informed Woods that she was employed part-time and was involved in marriage dissolution proceedings in Kane County. Respondent informed Woods that the children "were taken away from her by [Randall] due to false allegations," and that the children "need to be removed from [Randall's] care because they are truant in school." Woods also had an in-person conversation with Randall, who informed her that "he had to attend court proceedings" on February 11 and "called the police when Jennifer and Joshua refused to attend school." Randall informed Woods that the children

_____

[4]The specific details of Randall's "brain injury" are not clear from the record, but the injury appears to date from a blow to the head Randall received during an altercation between himself and one of respondent's daughters from a previous relationship.

"will not listen to him and he can no longer care for them due to their defiant behavior and severe mental illness." Randall also informed Woods that he "has brain damage and has done the best he could." Woods met with Jennifer at school to take her into protective custody, but during the meeting, "Jennifer became aggressive and had to be restrained by two police officers and transported to St. Alexius Hospital for psychiatric treatment."

¶ 15    The parties also stipulated to the foundation and admissibility of the prior indicated report for Randall and respondent, which was offered into evidence as People's Exhibit 1. The report was dated March 8, 2010, and under "Narrative," provided: "[Redacted] called and reports that Jennifer was presented at her facility in handcuffs by the police. According to [redacted] Jennifer attacked her brother[,] poking him in the eye with a stick. There is said to be an injury. Jennifer then fought her teachers, police, her father and hospital staff to the point she had to be sedated. The parents do not know what her medications are, what the dosages are or who her psychiatrist is. The father states Jennifer is always fighting her brother. The father also states that he and the children are tortured by the mother. Asked to define torture the father said that Ann is always yelling, screaming and cursing at them. The father states that Jennifer sleeps in his bed so that she can be protected from the mother." A later narrative provides: "Mandated reported called to report that Randy brought Jennifer into the police station because Jennifer has a scratch on her arm the size of a fingernail. Jennifer said that she was screaming at her mother in her face and Anne [*sic*] grabbed her arm causing the small scratch. Reporter states that Jennifer and Randy gave other incidents where Anne [*sic*] hurt Jennifer but were unable to give a time or details. No added allegations nor participants."

¶ 16    Finally, the parties stipulated that if called to testify, Dr. Roger Hatcher, a licensed clinical psychologist and "Registered Custody Evaluator," would testify that he conducted a custody evaluation of the family in July 2011 in connection with the Kane County dissolution proceedings and that he would testify consistently with the written report of his conclusions. The written report was offered as People's Exhibit 2, and the parties stipulated to the foundation and admissibility of the report.

¶ 17    The report was dated July 25, 2011, and in it, Hatcher expressed the "strong opinion" that Randall should be awarded sole custody of the children, noting that "[t]he level of cooperation and communication between the parents is so poor that joint parenting is not likely." Hatcher stated that "[b]oth children very strongly express their wish to live with their father and, in fact, ask not to be forced to visit their mother" and further pointed out that "the emotional and psychiatric outbursts in the past year can be almost solely tied to the chaotic conditions at the house which Ann approved of and the children's volatile relationship with Ann." Hatcher also noted that "[a]lthough both parents have denied physical or emotional abuse of the children, and there have been no findings of abuse or neglect by authorities, there is cause for concern based on statements of the children that they have been hit repeatedly and called 'mental retards' and other demeaning names by [Ann]. *** [T]his factor strongly favors the father as the preferred custodial parent."

¶ 18    In the report, Hatcher also made a recommendation as to visitation: "With regard to visitation with the mother, it is my recommendation that it be restricted to telephone contacts twice weekly as presently ordered. Both children should be involved in counseling with the goal of involving the mother in the counseling process at some point and eventually being able to visit freely with the children on an unrestricted basis. However, this is likely to take

considerable time, perhaps as much as one or two years, and must wait upon the psychological stability and emotional security of the children."

¶ 19 At the adjudication hearing, the juvenile court found that the State had not sustained its burden concerning the allegation of abuse, but entered an order finding Jennifer neglected due to lack of care and injurious environment, inflicted by Randall, because: "(1) The divorce decree gave custody of Minor to Father. (2) Father made statements to the police and to DCFS that he left Minor and her sibling unsupervised in the home because he no longer wanted to care for Minor. (3) Police found Minor and her sibling unsupervised in the home." On the same day, the juvenile court entered an identical order finding Joshua neglected due to lack of care and injurious environment.

¶ 20 At the adjudication hearing, after the juvenile court had made its findings, Joshua's former foster parent informed the court that Joshua was no longer in her care because, "for months, we have not felt safe in our home with Josh." She related several incidents in which Joshua displayed threatening behavior, culminating in Joshua "predict[ing] [her] future" by telling her, "with zero affect[,] *** you are going to die." However, she stated that she and her husband liked Joshua and wished to remain involved with his life in a mentoring capacity.

¶ 21                               II. Dispositional Hearing
¶ 22 On April 8, 2014, the parties came before the juvenile court for a dispositional hearing.

¶ 23                                    A. Exhibits
¶ 24 Prior to calling its first witness, the State offered into evidence a copy of the January 22, 2014, service plan for both children, as well as a group exhibit that included a March 4, 2014, progress report from respondent's therapist, both of which were admitted into evidence without objection.

¶ 25 The January 22, 2014, service plan indicated that respondent attended individual therapy but that her sessions were discontinued because respondent "was obstinate in her role [in] contributing to the incident." The service plan further stated that "Mom wants to contact the children but both Joshua and Jennifer refused to meet with her hence no visitation has taken place yet." With regard to Jennifer's relationship with her parents, the service plan indicated that Randall had supervised visits but that "Jennifer doesn't want to see her mom." With regard to Joshua's relationship with his parents, the service plan stated that there had been visits with Randall but "[t]he child has no visits with his mother. He refused to go. He received therapy to address those issues and has received cards and gifts from his mother for past holidays." For both children, the permanency goal was to return home to Randall within 12 months; the narrative underlying the permanency goal in Joshua's case stated that "[t]hey do not want to be reunited with their mother."

¶ 26 Respondent's March 4, 2014, quarterly progress report indicated that respondent "denies ever being physically abusive to her children or husband" and instead claimed that Randall was abusive to her. She reported that Randall " 'stole' " the children from her and " 'made up a bunch of lies and made the children believe she was the bad one.' " Respondent felt that everyone involved with her dissolution proceeding had " 'failed' her," but felt hopeful that she could reestablish a relationship with her children now that DCFS was involved; however,

according to DCFS, the children "currently do not want to see their Mom." The report indicated that respondent was attending counseling on a biweekly basis, and recommended continued counseling. The report stated: "Despite documentation this worker received from DCFS that provides evidence that Ann was abusive to her children Ann denies the actions[.] [E]ven when confronted with specific incidences, Ann offers explanations for why the children said the things they said (i.e. their father made them/told them to say things, or they were made to believe things that were not true). In working with Ann she is trying to focus on how she can reestablish a relationship with her children and how she can help foster reunification. Future family counseling with Ann and her children will be based on recommendations from the children's therapist. In time this worker hopes to be able to communicate with the children's therapist."

## B. Paul Cassioppi

Paul Cassioppi testified that he was employed at the Rock River Residential Center, where he was currently assigned as the placement worker for Jennifer, who was residing there. Jennifer was not currently at Rock River, because she had been psychiatrically hospitalized on April 6. Cassioppi testified that Jennifer received 60 minutes of individual therapy a week, daily group therapy, four days a week of "expressive therapy," as well as therapy while attending her "therapeutic day school." Jennifer was diagnosed with bipolar disorder and oppositional defiance disorder, and also had a learning disability. She was prescribed psychotropic medications for her disorders, and was "a little bit better" with medication compliance, which had been "one of her primary issues." Cassioppi testified that "[s]he was having some issues taking her medication initially when she first came into placement and when she tends to struggle she tends to have issues with taking her medication as well."

## C. John Dugan

John Dugan testified that he was employed by DCFS and was the family's currently assigned caseworker. Dugan testified that he last visited Jennifer at Rock River on March 14, and determined the placement to be safe and appropriate. He further testified that Joshua was currently placed in a foster home in Elburn, which was a change in the placement, as his previous foster parents terminated his placement at their home due to issues with his behavior; however, the previous foster parents expressed their wishes to remain involved in Joshua's life in a mentor capacity. Dugan had visited Joshua at his foster home within the past 30 days and determined the placement to be safe and appropriate and that Joshua was "doing very well in this new foster home." Dugan testified that Joshua had a "mental health diagnosis" but was not prescribed any medication; Dugan later testified that Joshua had previously been diagnosed with bipolar disorder. Joshua was attending therapy with a therapist that was assigned to the family, but would "[e]ventually" be transitioned to "community based individual therapy."

Dugan testified that respondent had completed six parenting classes, including a class conducted by the National Alliance for Mental Illness (NAMI) concerning children with mental health issues, and was currently engaged in individual therapy; she was not in need of any outstanding services. Dugan had reviewed the therapy report, and "at this point there are concerns with [respondent] accepting the reason as to why the case came into the system

with the therapist"; Dugan testified that "the therapist was able to talk with Jennifer's therapist and they discussed how, you know, both children are not wanting contact with the mother right now. So the current–mother's current therapist wants to explore that issue with her." Dugan testified that currently, respondent did not have any visitation with either child "per Jennifer and Joshua's wishes," but he would reassess the visitation plan if those wishes were to change, since he "always tr[ied] to encourage contact between the parents and the children." Dugan testified that respondent had requested therapeutic parent-child visits with her children, but had not received one with either child. Respondent had stable housing and was employed;[5] she also sent a number of cards to her children.

¶ 32    Dugan testified that Randall had informed him that he was receiving counseling services, but that Randall had not yet signed the consent forms to permit Dugan to communicate with the counselor. Randall had "numerous medical issues" that he was addressing to the best of his ability and visited Jennifer and Joshua regularly. There were no issues with the appropriateness of the visits; "[b]oth children look forward to seeing him. They're very bonded to him." Dugan also testified that Jennifer and Joshua visited each other every other week.

¶ 33    Dugan testified that DCFS recommended that both Jennifer and Joshua be adjudicated wards of the court and be placed in the custody of the DCFS guardianship administrator with the right to place the minors. The basis of that recommendation was "[t]hat they're not wishing contact with mother at this time. The father has, you know, a brain injury that he's trying to deal with medically so return home is not possible right now." The agency recommended a permanency goal of returning home to Randall in 12 months, which Dugan believed was in the children's best interest.

¶ 34                              D. Respondent

¶ 35    Respondent testified that she had participated in parenting classes, including a 12-session NAMI parenting class that focused on family members with mental illness. After completing the NAMI course, she continued to participate in a NAMI parenting support group. Respondent testified that she continually asks to participate in family therapeutic visitation with her children, which has not been provided; that her oldest daughter[6] and mother wanted to visit the children, but there had been no visitation provided; and that her only method of communicating was through cards she sends to her children every two weeks.

¶ 36                         E. Juvenile Court Ruling

¶ 37    On April 8, 2014, the juvenile court entered a disposition order finding it in Jennifer's best interest to be adjudged a ward of the court and finding respondent unable for some reason other than financial circumstances alone to care for, protect, train, or discipline Jennifer. The court further found that reasonable efforts had been made to prevent or eliminate the need for removal of Jennifer from her home. The court placed Jennifer in the

---

[5]Respondent later testified that she was unemployed.

[6]Respondent had two older daughters from prior relationships.

custody of a DCFS guardianship administrator with the right to place Jennifer. The juvenile court entered an identical order concerning Joshua on the same day.

¶ 38 The court also found that it was in the best interests of the children to set a permanency goal of returning home within 12 months.[7] With regard to respondent's request for therapeutic visitation with the children, the court noted that both Dugan and Cassioppi continued to speak with the children's therapists concerning visitation with respondent. However, the court further noted that "if the therapists feel it's not in the best interest of the minor to have the visits–considering that at this point apparently both minors do not wish the visit then *** that's what happens. As long as they continue to bring it up and it's an issue, and the children's minds could change on that, then perhaps hopefully therapeutic visits will–can begin in the future but at this point there is a finding of no substantial progress."

¶ 39 Respondent timely appealed, listing both the findings at the adjudication hearing and the findings at the disposition hearing on her notice of appeal.

¶ 40 ANALYSIS

¶ 41 On appeal, respondent argues that the juvenile court's finding that she was unable to care for her children and its finding that "reasonable efforts had been made to prevent or eliminate the need for removal of the minor[s] from the home" were against the manifest weight of the evidence. We note that although respondent lists the adjudication hearing on her notice of appeal, she makes no arguments concerning the juvenile court's findings in her brief. Consequently, she has waived any arguments concerning the propriety of the juvenile court's findings at the adjudication hearing (Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived ***.")), and we consider only the juvenile court's findings at the dispositional hearing.

¶ 42 "The Juvenile Court Act is a statutory scheme, created by the legislature, the purpose of which is to secure for each minor subject thereto the care and guidance which will best serve the minor's safety and moral, emotional, mental and physical welfare, and the best interests of the community." *In re Austin W.*, 214 Ill. 2d 31, 44 (2005) (citing 705 ILCS 405/1-2 (West 2000)). Under the Juvenile Court Act of 1987, once a minor has been found to be abused, neglected, or dependent, the juvenile court must schedule a dispositional hearing. 705 ILCS 405/2-21(2) (West 2012). "At the dispositional hearing, the court shall determine whether it is in the best interests of the minor and the public that he be made a ward of the court, and, if he is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2012). The court may place the minor under DCFS guardianship if the court determines that the child's parents "are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2012).

¶ 43 The finding that a parent is unable to care for, protect, train or discipline her child, as occurred in the case at bar, must be supported by the preponderance of the evidence. *In re*

---

[7]Respondent is not appealing the juvenile court's permanency order.

*D.W.*, 386 Ill. App. 3d 124, 139 (2008). " 'Preponderance of the evidence is that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not.' " *D.W.*, 386 Ill. App. 3d at 139 (quoting *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997)). However, "[i]n all cases, it is the health, safety and interests of the minor which remains the guiding principle when issuing an order of disposition regarding the custody and guardianship of a minor ward. The best interests of the child is the paramount consideration to which no other takes precedence." *Austin W.*, 214 Ill. 2d at 46.

¶ 44    A dispositional order is generally considered final for the purposes of appeal. *In re Faith B.*, 216 Ill. 2d 1, 3 (2005); *Austin W.*, 214 Ill. 2d at 44. A reviewing court will reverse the juvenile court's determination "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006); see also *In re Malik B.-N.*, 2012 IL App (1st) 121706, ¶ 56; *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009); *In re Gabriel E.*, 372 Ill. App. 3d 817, 828 (2007). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004) (citing *In re Edward T.*, 343 Ill. App. 3d 778, 794 (2003)). "Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision." *In re April C.*, 326 Ill. App. 3d 245, 257 (2001) (citing *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998)). "Ultimately, there is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re William H.*, 407 Ill. App. 3d 858, 866 (2011) (quoting *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005)).

¶ 45    In the case at bar, we cannot find that the juvenile court's determination that respondent was unable to care for her children was against the manifest weight of the evidence. Respondent correctly states that she was not in need of any outstanding services and that she had completed a number of parenting classes, including one specifically concerning children with mental illnesses. However, the record also reflects that respondent continued to deny that she ever physically or emotionally abused the children, despite being presented with evidence to the contrary. Instead, according to the progress report from her therapist, "Ann offers explanations for why the children said the things they said (i.e. their father made them/told them to say things, or they were made to believe things that were not true)." We agree with the public guardian that it is difficult to imagine how Jennifer and Joshua could be returned to respondent's care when they claim that she was emotionally and physically abusive to them and when respondent denies such claims. Consequently, in light of respondent's refusal to consider her role in the family's troubles, we cannot find that the juvenile court's finding that she was unable to care for Jennifer and Joshua was against the manifest weight of the evidence.

¶ 46    Moreover, we cannot find that the juvenile court erred in finding that it was in the children's best interest to be made wards of the court and placed in DCFS custody. Respondent's arguments on appeal focus solely on her efforts and her desires to be reunited with her children. However, "[t]he best interests of the child is the paramount consideration to which no other takes precedence." *Austin W.*, 214 Ill. 2d at 46. In the case at bar, both Jennifer and Joshua have emotional and mental health issues that require careful consideration in determining their placements; Jennifer had been psychiatrically hospitalized

- 10 -

several times, and Joshua had been removed from a foster home due to his issues. With regard to their mother, both Jennifer and Joshua consistently stated that they had no wish to return to her care or even to visit with her; for this reason, the children did not have visitation with respondent. We also note that Jennifer and Joshua are not young children, but are teenagers; thus, their wishes cannot be lightly brushed aside. Given the children's fragile emotional and psychological states and their express desire not to visit with their mother, we cannot find that the juvenile court erred in finding that it was in their best interest to be made wards of the court and placed in DCFS custody.

¶ 47 Respondent argues that "[i]t is always in the best interest of the child to be reunited with his biological family." Sadly, that is not always the case. In a situation such as this one, where respondent's presence in her children's lives appears to actually cause them psychological harm, we can find no error in the finding that it was not in their best interest to be returned to her care. We note, as did the juvenile court, that Jennifer's and Joshua's therapists continue to explore the possibility of visits with respondent. Hopefully, when the children are psychologically ready, respondent will be able to resume some form of relationship with them.

¶ 48 Respondent also takes issue with the juvenile court's finding that reasonable efforts had been made to prevent or eliminate the need for removal of the children from their home. The juvenile court's finding of reasonable efforts occurred in the course of its disposition ruling and is reviewed in the same way as any other decision made during that ruling. *William H.*, 407 Ill. App. 3d at 866. Again, a reviewing court will reverse the juvenile court's determination "only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *Kamesha J.*, 364 Ill. App. 3d at 795.

¶ 49 As an initial matter, we note that respondent's brief focuses on the juvenile court's ruling "that all reasonable efforts were made to reunite the family." However, that does not accurately reflect the court's ruling. The court actually found "that reasonable efforts have been made to prevent or eliminate the need for removal of the minor[s] from the home." As these are not interchangeable concepts (*William H.*, 407 Ill. App. 3d at 865), we consider the propriety of the finding actually made by the juvenile court.

¶ 50 In the case at bar, we cannot find that the juvenile court's reasonable efforts finding was against the manifest weight of the evidence. The record is clear that Jennifer and Joshua could not be turned over to respondent's care, and as we discussed above, the juvenile court's finding that respondent was unable to care for the children was not improper. Respondent persists in denying any role in the family's troubles, and Jennifer and Joshua flatly refuse to visit with her. Nevertheless, all caseworkers and therapists involved in the instant case worked with respondent, Jennifer, and Joshua in an attempt to progress to the point at which there could be parent-child visits. The fact that parent-child visits have not yet occurred is not through any fault of DCFS or any of the therapists involved. Instead, as Hatcher noted in his custody evaluation, progression to the point of visitation is something that "is likely to take considerable time *** and must wait upon the psychological stability and emotional security of the children." We also note that the juvenile court questioned Cassioppi and Dugan, Jennifer's placement worker and the family's caseworker, specifically to make sure that the issue of visitation with respondent was something that continued to be brought up with the children's therapists, and both confirmed that it was. Thus, we cannot find that the juvenile

court's finding that reasonable efforts had been made to eliminate the need for removal of the children from their home was against the manifest weight of the evidence.

¶ 51                                              CONCLUSION

¶ 52        The juvenile court's dispositional ruling is affirmed where it was not against the manifest weight of the evidence for the juvenile court to find: (1) that respondent was unable to care for her children, (2) that it was in the children's best interests to be made wards of the court, and (3) that reasonable efforts were made to prevent or eliminate the need for removal of the children from the home.

¶ 53        Affirmed.