NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 210252-U

NO. 4-21-0252

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 1, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* B.D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
|     Petitioner-Appellee, | ) | No. 21JA1 |
|       v. | ) | |
| Michael D., | ) | Honorable |
|     Respondent-Appellant). | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's adjudicatory order finding the minor neglected and dispositional order finding parental unfitness were not against the manifest weight of the evidence.

¶ 2    In January 2021, the State filed a petition for adjudication of neglect, alleging B.D. (born May 15, 2015) was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)), in that his environment was injurious to his welfare when he resided with his father, respondent Michael D., because there were substance abuse and lack of supervision issues in the home. The State also alleged B.D. was abused pursuant to section 2-3(2)(ii) of the Juvenile Court Act (705 ILCS 405/2-3(2)(ii) (West 2020)), because respondent created a substantial risk of physical injury due to the substance abuse and lack of supervision issues in respondent's home. B.D.'s mother, Meghan C., is not a party to this appeal.

¶ 3        In February 2021, the trial court entered an adjudicatory order finding the minor abused and neglected. Following an April 2021 dispositional hearing, the trial court (1) made the minor a ward of the court, (2) found respondent unfit, and (3) placed custody and guardianship of the minor with the Illinois Department of Children and Family Services (DCFS).

¶ 4        Respondent appeals, arguing the trial court's adjudicatory and dispositional orders were against the manifest weight of the evidence. We affirm.

¶ 5                                    I. BACKGROUND

¶ 6        In January 2021, the State filed a petition for adjudication, alleging B.D. was (1) neglected in that his environment was injurious to his welfare when he resided with respondent, who was the custodial parent, due to substance abuse and lack of supervision issues (705 ILCS 405/2-3(1)(b) (West 2020)) and (2) abused in that respondent's home created a substantial risk of physical injury to the minor by other than accidental means which would likely cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function, due to substance abuse and lack of supervision issues (705 ILCS 405/2-3(2)(ii) (West 2020)). The petition also alleged the family had a history with child protection services involving substance abuse and physical abuse.

¶ 7                                A. Adjudicatory Hearing

¶ 8        On February 25, 2021, an adjudicatory hearing commenced. We summarize the evidence necessary to resolve this appeal.

¶ 9                                1. *Emily Vance-Nuckolls*

¶ 10        Emily Vance-Nuckolls, a DCFS drug screen collector supervisor at Help at Home, testified that on December 17, 2020, respondent did not appear for a scheduled drug screen. He did appear on December 18, 2020. She had two orders for him: urine and hair. Because respondent

"only had like an inch of hair," the test was inconclusive. For the urine test, she stood at the door and listened. She found nothing unusual about respondent's test. On December 28, 2020, respondent appeared, and his hair "was even shorter." She asked for hair anywhere else on his body and respondent told her he was "a hairless guy," so she "took his word on it." Because his hair was even shorter than before, the test "was way inconclusive." She had no further dealings with respondent.

¶ 11 On cross-examination, Vance-Nuckolls said the results of the urine tests on December 18 and 28, 2020, were both negative.

¶ 12 *2. Stefanie Moreau*

¶ 13 Stefanie Moreau, a DCFS child protection specialist, testified that on December 8, 2020, she became involved with this family after DCFS received a hotline call. She went to respondent's home on December 9, but no one was home. She went back on December 10 and saw B.D. playing basketball outside by himself. When she pulled up, B.D. went to the front door and went inside. When she approached the front door, B.D. was standing inside. Moreau asked B.D. if he could go get his dad or another adult. Respondent came to the door "two to three minutes" later. Moreau went inside. She advised respondent of the hotline allegations regarding inadequate supervision, medical neglect, and substance abuse. Respondent denied using drugs but admitted having a prior issue with alcohol. He agreed to a drug test initially but then advised Moreau that he remembered he took Adderall, a drug for which he did not have a prescription, the day prior. Moreau administered the saliva instant test, but it was inconclusive because respondent would not keep the test in his mouth properly.

¶ 14 Moreau spoke with respondent about implementing a safety plan that would require (1) B.D. to be removed from his care, (2) his participation in mental health and substance abuse

assessments, (3) he submit to three random drug screens, and (4) he commit to remaining drug-free. The plan would allow for supervised visits between respondent and B.D.

¶ 15　　　　Moreau testified she spoke with respondent about the inadequate supervision allegations. She explained to respondent that she saw B.D. outside alone when she arrived at his home. She said respondent was "kind of like blasé about it." She asked respondent about the allegations of B.D. going to play at a church across the street and to a friend's house "down the road" by himself. Respondent admitted these things but said it was not a "big deal" because B.D. was a smart kid.

¶ 16　　　　According to Moreau, the medical neglect allegations stemmed from a reported incident of a friend sticking a Q-tip in B.D.'s ear, causing it to bleed. Moreau looked in B.D.'s ear and found dried blood. When she asked respondent about the incident, he said B.D. had not told him about it until a week or two after it had happened. Respondent said he asked B.D. if it still hurt at that point and B.D. told him it did not, so respondent thought he was okay.

¶ 17　　　　Moreau required respondent to submit to a hair drug screen because she had learned from the reporter that in another family case in which respondent was involved, he would manipulate the urine test at Help at Home because he knew there was no male observer. She recalled respondent's hair being approximately an inch and a half when she appeared at the home on December 10. She next saw respondent on December 17 when she administered an oral screen. She advised respondent if he was unable to complete the oral screen, it would be noted as a positive result. Moreau testified respondent "had [it] in his mouth maybe [a] minute—and said again, 'I don't—I don't have saliva' and handed it back to [her]. And he said 'whatever—whatever it means is whatever—whatever it is.' "

¶ 18　　　　Moreau said she advised respondent to report to Help at Home later that day

(December 17) for a urine drug screen. Respondent did not appear, so the screen counted as a positive result. He told Moreau he reported to Heritage instead of Help at Home, which did not make sense to Moreau since respondent had always gone to Help at Home, even with the prior case. She told him to report to Help at Home the next day, December 18. Respondent questioned "how far will that go back," as he had reportedly used Ecstasy twice in the prior six months. She requested respondent report for another screen on December 24, but he did not go.

¶ 19        Moreau testified she visited respondent's home on December 24 and expressed her concern that he was not cooperating with the oral drug screens. She showed him a video that was "provided to [her]" of "a pipe that was on his stove." Respondent confirmed it was his stove and admitted he used to deal drugs from his home. He told her customers would use the drugs in his home at a time when B.D. was living with him. Respondent told Moreau he quit dealing drugs "a month or two ago." Moreau scheduled respondent to have another drug screen on December 28, which respondent attended. His urine sample tested negative, and his hair sample was of insufficient quantity to test.

¶ 20        Moreau testified she was to meet respondent at the safety monitor's home on December 31, but he failed to appear or to contact her. She contacted him later that day to advise she had taken protective custody of B.D. because of the issues with his hair and saliva screens, his admission of taking a drug that was not prescribed to him, and his recent history of selling drugs from his home.

¶ 21        On cross-examination, respondent's counsel questioned Moreau about administering the saliva test. Moreau explained that respondent would not leave the swab in his mouth long enough to generate a sufficient amount of saliva. In her opinion, respondent "was doing what he could [t]o not put saliva on it." She said she had "administered this to several people.

- 5 -

And he [was] the first parent and [the only parent] since that could not produce enough saliva to *** get a reading."

¶ 22    Counsel asked Moreau if she was under investigation by the Office of the Inspector General. She said she became aware of that the day before the hearing but she had not heard what the investigation was about. After Moreau's testimony, the State rested.

¶ 23                                3. *Respondent*

¶ 24    Respondent testified he was involved in a prior DCFS case related to B.D. As part of that case, he was required to participate in random drug screens and successfully completed each with no positive results. He said, at the close of that case, B.D. was returned to his care.

¶ 25    Respondent explained he has "dehydration" and a "dry mouth" so the oral tests "just didn't work" for him. He said he missed the hair follicle test on December 17 because he believed Moreau told him to report to Heritage, which he did. He then went to Help at Home on December 18. He said on December 24, Moreau called him at 10:30 a.m. and told him to report for the drug screen at 11:45 a.m. He said he had just gotten up, but he would try to make it. He thought if he did not make it by 11:45 a.m., he could go after the lunch hour. He was not aware they closed early on Christmas Eve. At 12 p.m., respondent said, Moreau walked into his house and began yelling at him for missing appointments.

¶ 26    Respondent testified there was no truth to Moreau's testimony about him previously selling drugs from his home. And, with regard to B.D. being outside alone, respondent said he could "literally see everything" from his kitchen table. On the day Moreau came to his house, B.D. had "just stepped out" to play catch with his 22-year-old brother when Moreau arrived. Respondent said B.D. "was literally out there a couple seconds before" his brother went outside. Respondent said he was asleep at the time.

¶ 27    Respondent said he keeps his hair pretty short. He cuts it weekly himself using a "number one guard so, it's like an eight[h] inch." When asked about body hair, respondent said he does not have any hair on his body.

¶ 28    Respondent did not hear about B.D.'s ear incident until DCFS told him. B.D. had spent "a couple of nights" with his friend and apparently had told his friend's mother about it, but respondent did not find out until this case was opened.

¶ 29    On cross-examination, respondent said he had three convictions for driving under the influence. He also admitted that all of his prior drug screens had been done at Help at Home.

¶ 30                                          4. *Trial Court's Finding*

¶ 31    At the close of evidence, the trial court concluded the State proved the allegations of neglect and abuse in the petition by a preponderance of the evidence. Specifically, the court found Moreau's testimony to be credible, while respondent's testimony was not.

¶ 32    On February 26, 2021, the trial court entered a written adjudicatory order finding B.D. neglected and abused, noting the bases as "substance abuse and lack of supervision in father's home."

¶ 33                                    B. Dispositional Reports

¶ 34    On March 10, 2021, Lutheran Children and Family Services (LCFS) filed a report recommending B.D. be made a ward of the court with a permanency goal of return home in 12 months. However, the caseworker noted the likelihood of respondent regaining custody of B.D. within the next 5 to 12 months was "guarded." Respondent had voiced his commitment to reunification, claiming he "will do whatever it takes," but thus far, his primary focus had been "the [wrongdoings] of the investigator and the system," not compliance with the recommended services. Respondent reported he had submitted to substance abuse and mental health assessments,

although LCFS had not confirmed his claim. No integrated assessment had been completed for this case. LCFS noted respondent had participated in an integrated assessment for the prior DCFS case in 2017.

¶ 35                                    C. Dispositional Hearing

¶ 36            On April 15, 2021, the trial court conducted a dispositional hearing. The court noted the parties' appearances then, the State called its witness to testify.

¶ 37                                    1. *Tamika Hatchet*

¶ 38            Tamika Hatchet, the LCFS supervisor, testified this case was brought into care based on allegations of drug use in respondent's home. She said the integrated assessment had been scheduled but not completed, so there were no required services of respondent. They had asked he comply with visitation and "he [had done] very well with that." He was also asked to submit to random drug screens but because Help at Home did not have a male worker, she was advised not to order them further until a male had been secured because it had been reported that respondent switches urine. She had also requested he engage in mental health services, but she had "not gotten anything back yet."

¶ 39            In Hatchet's opinion, it was in B.D.'s best interest that he be made a ward of the court because respondent had not been able to get into any services through no fault of his own. She did not think B.D. could safely return home until respondent could engage in services. She said a parent generally needs to show six months of sobriety before the child can be returned to the parent's care.

¶ 40                                    2. *Respondent*

¶ 41            Respondent testified he had been sober for five years. However, he did not attend Alcoholics Anonymous or any similar programs. He said he had completed assessments for

substance abuse and mental health with no recommendations for further services. He had completed everything DCFS had asked of him.

¶ 42 On cross-examination, respondent said he considers himself an alcoholic, not an addict. He would be willing to participate in any group requested of him, as he would do whatever he needed to do to get his son back.

¶ 43                              3. *The Trial Court's Finding*

¶ 44 After taking into consideration the dispositional report on file, the testimony given at the hearing, and the recommendations of the parties, the court found it was in best interest of the minor and the public that the minor be named a ward of the court. The court found Hatchet's testimony to be credible but found, "with all due respect," respondent's testimony about his length of sobriety incredible.

¶ 45 On April 15, 2021, the trial court entered a written dispositional order (1) making B.D. a ward of the court, (2) finding respondent unfit, and (3) placing custody and guardianship of B.D. with DCFS.

¶ 46 This appeal followed.

¶ 47                              II. ANALYSIS

¶ 48 On appeal, respondent asserts the trial court's adjudicatory and dispositional findings were against the manifest weight of the evidence.

¶ 49 The Juvenile Court Act provides a two-step process the trial court must follow in deciding whether a minor child should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 17; see also 705 ILCS 405/2-18(1), 2-22(1) (West 2020). Step one of the process is the adjudicatory hearing where the trial court considers only whether the child is abused, neglected, or dependent. See *id.* § 2-18(1). The State bears the burden of proving a neglect allegation by a

preponderance of the evidence. *A.P.*, 2012 IL 113875, ¶ 17. An appellate court will not reverse a trial court's finding unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 50 Following an adjudication of neglect, the trial court must conduct a dispositional hearing to determine if the minor should be made a ward of the court. 705 ILCS 405/2-22 (West 2020). In considering the appropriateness of wardship, the court must decide if the parent is unfit, unable, or unwilling, for reasons other than financial reasons alone, to care for, protect, train, or discipline the child, and that the health, safety, and best interest of the child will be jeopardized if the child remains in the parent's custody. *Id.* § 2-27(1). We will not overturn the court's dispositional order unless it is against the manifest weight of the evidence. *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 44.

¶ 51 Here, the State presented evidence at the adjudicatory and dispositional hearings about respondent's (1) history of substance abuse, (2) recent lack of cooperation with the investigator's request for drug screens, (3) recent drug sales from his home while B.D. was present, and (4) lack of supervision of B.D. Whereas respondent not only denied each of the State's claims but provided contrary "versions" of each. Thus, the trial court's decision came down to a credibility contest. Here, the court specifically found it believed the State's witnesses over respondent.

¶ 52 Our review of the evidence indicates the trial court's findings were not against the manifest weight of the evidence. We give deference to the court's findings of fact because the court "is in the best position to observe the conduct and demeanor of the parties and the witness and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain." *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002).

¶ 53 In this instance, evidence existed to support the court's finding respondent

struggled with substance abuse, was not adequately supervising B.D., and the combination thereof created an injurious environment and a substantial risk of physical injury to B.D. Because respondent had not had the opportunity to address the issues, the court found respondent unfit and that it was in B.D.'s best interests to make him a ward of the court. We cannot say the opposite conclusions are clearly evident. We therefore conclude the trial court's adjudicatory and dispositional findings were not against the manifest weight of the evidence.

¶ 54                                III. CONCLUSION

¶ 55          For the foregoing reasons, we affirm the trial court's judgment.

¶ 56          Affirmed.