NOTICE

Decision filed 03/03/21 The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2021 IL App (5th) 200311

NOS. 5-20-0311, 5-20-0312 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| *In re* L.W. and O.W., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Marion County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 20-JA-18, 20-JA-19 |
| v. | ) | |
| | ) | |
| Jacob W., | ) | Honorable Ericka A. Sanders and |
| | ) | Honorable Mark W. Stedelin, |
| Respondent-Appellant). | ) | Judges, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court, with opinion.
Justices Welch and Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent, Jacob W. (Father), appeals the trial court's findings that it was in the best interest of the minor children to make them wards of the court and that he was unable to care for his minor children. Father also appeals the trial court's dispositional order granting custody and guardianship of the minor children to the Illinois Department of Children and Family Services (DCFS). Father argues the trial court erred by (1) ignoring the parental presumption of fitness, (2) failing to provide written findings in support of the determination pursuant to section 2-27 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-27 (West 2018)), and (3) considering unpaid child support as a factor against Father. For the following reasons, we reverse.

1

¶ 2                                    BACKGROUND

¶ 3     O.W. and L.W., Father's biological children, are the only children involved in this appeal. Accordingly, the facts below are limited solely to those necessary for clarification or relevant to the dispositional findings regarding O.W. and L.W.

¶ 4     On January 27, 2020, when O.W. was three years old and L.W. was two years old, DCFS received a report from Salem Township Hospital that a nine-month-old was at the facility with a broken right tibia and that the mother (Mother), who lived in a household separate from that of Father, waited a week to bring the child to the facility.[1] Facility personnel further reported that Mother brought L.W. to the facility a week earlier and L.W. was diagnosed with an acute nondisplaced oblique fracture of the left tibia at that time. Mother could not provide a viable answer to how the injuries occurred, and the children were taken into protective custody on January 28, 2020.

¶ 5     On January 29, 2020, the State filed petitions for adjudication of wardship and temporary custody regarding L.W. and O.W., alleging the minors were neglected pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)). The petitions alleged the children were in an injurious environment due to two siblings having broken tibias in less than a week while in the care of Mother without adequate explanation. A shelter care hearing found there was probable cause to believe the children were neglected as defined by the Act. The children were removed from Mother's custody, and temporary custody was granted to DCFS.

¶ 6     Following background and home safety checks, L.W. and O.W. were placed with their biological father, Jacob W., on February 14, 2020.

_____

[1]At the time of the dispositional hearing, Mother had four minor children and was pregnant with her fifth. As noted above, two of the minors, K.F. and R.B., are not subjects of this appeal. K.F. was the infant diagnosed with a broken right tibia on January 27, 2020.

¶ 7 On June 1, 2020, an adjudicatory hearing was held, at which time Mother appeared with counsel and admitted that two of the minor children suffered broken tibias in less than a week without any obvious explanation how the injuries occurred while in her care. The trial court issued a dispositional order finding that the minor children were abused or neglected as defined by section 2-3 of the Act and that the children were in an environment that was injurious to their welfare as defined by section 2-3(1)(b) of the Act.

¶ 8 On June 25, 2020, DCFS submitted a report for the dispositional hearing. DCFS noted background checks of Father and his household members were completed prior to and after the children were placed with him on February 14, 2020. The home safety checklist was also completed. DCFS noted Father was employed and worked 12-hour shifts, three times a week. The agency further noted that O.W. was unable to start prekindergarten due to COVID-19 school closures but that Father planned to enroll O.W. if school resumed in the fall. O.W. was healthy, up to date, and did not need a well-child exam until March 2021. L.W. required a cardiologist appointment for his heart murmur. His prior appointment was scheduled during the pandemic, and DCFS noted that hospitals were now scheduling regular intake appointments. L.W. was due for a well-child exam in November 2020. DCFS found that "both youth in care appear to have adjusted to their placements, are safe and doing well. Therefore, at this time, DCFS would recommend that Custody and guardianship be awarded to [Father] of [O.W. and L.W.]"

¶ 9 The DCFS family service plan, filed July 1, 2020, listed the desired outcome was for L.W. and O.W. to remain safe and in the home of Father, the nonoffending parent. Action steps for both children included attending and participating in an educational or developmental program and attendance at all scheduled doctor/medical appointments with a target completion date of September 13, 2020.

¶ 10    A DCFS integrated assessment was also filed on July 1, 2020. In this document, Mother reported that Father had "always been involved in the children's lives." After their relationship ended, Father paid her child support and visited the children often although neither were set up through the court. Mother stated Father lived in the Salem/Centralia, Illinois, area until October 2019, when he moved to Mendota, Illinois, where his mother lived. After Father moved to Mendota, he still visited the children, but not as often. Father had O.W. and L.W. over Christmas break. Mother was "fine" with Father having custody of their children because she knew he "would allow her to have visits with the children." Her desire to work toward reunification only involved K.F. and did not include O.W. or L.W. DCFS noted Father expressed a strong desire to keep O.W. and L.W. in his home. No safety concerns were noted. DCFS found Father could provide O.W. and L.W. with the stability, structure, and routine needed.

¶ 11    A DCFS family plan was filed on July 6, 2020. The objectives for Father, L.W., and O.W. remained the same as stated in the July 1, 2020, report.

¶ 12    A dispositional hearing was held on August 3, 2020. Mother and Father appeared with their respective attorneys, and Mother objected to Father receiving custody and guardianship of L.W. and O.W. Mother testified that when Father lived in Salem, Illinois, he would have the children every weekend and occasionally during the week when she would go grocery shopping so she would not have to take them. When Father moved to Mendota, Illinois, visitation changed to every other weekend or every third weekend, and there was never a set schedule. Mother confirmed Father had the children for two or three weeks right before he moved to Mendota. Mother testified that L.W. had a heart murmur and was originally scheduled for an echocardiogram in Mt. Vernon,

4

Illinois. She stated Adam[2] later rescheduled the appointment at Cardinal Glennon in St. Louis, Missouri. Mother admitted she never advised Father of the changed appointment but stated Adam told Father about the appointment. Mother did not know exactly when the appointment was and stated that, as far as she knew, Father did not attend the appointment. Mother also testified that she missed a telephone call on July 26 from Father that came in at 3:30 a.m. Mother saw the missed call when she awoke, called Father, and was told that L.W. was playing with the phone at that time. Mother confirmed L.W. was now three years old.

¶ 13    Following Mother's testimony, the guardian *ad litem* (GAL) noted Mother's testimony revealed no concerns about the safety or welfare of the children. The GAL agreed with DCFS's recommendation that the children have some permanency, that custody and guardianship be granted to Father, and that the case be closed. The State joined with the GAL's recommendation. Mother's counsel objected, stating there was not "enough information to just say these kids are totally fine with [Father] and close the case and stop all services for these two children. *** We agree making them wards of the Court with custody and guardianship with the [DCFS], but let's give mom a shot." Father's counsel stated the GAL correctly noted there were no concerns about the children's health, welfare, and safety during the six months Father had the children. Counsel noted that a caseworker visited Father's home and found it was fine. Father again requested custody and guardianship of his children and case closure.

¶ 14    Following argument, the trial court stated:

"I have considered the DCFS case report. I've considered the testimony of mother, the arguments of counsel, and the recommendation of the guardian

---

[2]Mother's testimony did not clarify the identity of "Adam"; however, based on the record, he would appear to be a relative of Mother.

5

*ad litem*. These kids living with their father in the Mendota area up north—Mendota, Illinois, according to the report, the only person that's laid eyes on these children in their father's home was a La Salle County DCFS worker.

The report indicates that assistance from La Salle County DCFS monitoring for [Father]. Last documented contact was July 1 by [DCFS] in the home of [Father]. No safety concerns noted.

That's the only thing we no [*sic*] know about [Father] at least according to this dispositional report, which should [have] everything we need to know or I need to know to make a recommendation or a decision about their best interest—is that no safety concerns were noted. ***

[Father] *** did have a relationship with them for a period of time. Had very consistent visitation with them. But once he moved to Mendota it was not as consistent. The report indicates that he was not consistent in paying child support.

The report indicates that he has been employed throughout the majority of time that the kids have been in care, but he's lost a couple of jobs now. It looks like perhaps one to COVID[ ] and one to not having a baby-sitter[,] who was his brother's girlfriend.

He didn't take the child to a follow-up doctor's appointment. Maybe the kids are doing wonderfully in [Father's] care, but I certainly don't know that from this report and all the information that's been provided.

So, I'm going to find that it is in [O.W. and L.W.'s] best interest that custody and guardianship be granted to DCFS. I'll find that that is in their best interest.

6

And if this [is] all Logan County DCFS is doing—well, we might as well give up. I don't know why we would put kids in another county besides this one, if all they're going to tell us is that there's no safety concerns in the house.

That's not sufficient information upon which the court could make a decision about the child's best interest."

¶ 15    On August 5, 2020, the trial court entered a dispositional order finding that both Mother and Father were unable to care for the children and it was in the best interest of the children to make them wards of the court. The order granted guardianship and custody to DCFS.

¶ 16    On August 21, 2020, Father moved for reconsideration, and the motion was set for hearing at 10 a.m. on September 28, 2020.

¶ 17    One hour before the reconsideration hearing, DCFS filed a report that noted L.W. had his echocardiogram exam on September 21, 2020, at OSF Medical Group in Mendota and was examined by Dr. Fulton at that time. DCFS contacted Dr. Fulton on September 25, 2020, and the physician had no concerns with the health and well-being of L.W. A follow-up visit was scheduled with a cardiologist for December 4, 2020, to ensure the tests and exams were normal. DCFS further indicated that in-person documented contact was made on August 31 by a public service administrator (PSA) at the babysitter's home. The PSA spoke with at least one of the children and questioned the caregiver about Father. The caregiver reported Jacob was a good father and took good care of his children. She further advised the PSA of L.W.'s appointments with Dr. Fulton. DCFS also noted that O.W. started in-person school on September 24 and that Father was employed.

¶ 18    At the September 28, 2020, hearing, Father argued it was not his burden to prove he was a fit parent and none of the findings supported a conclusion that he was an unfit parent, as there was

7

no evidence, or even a risk, that the children were physically abused, psychologically abused, or neglected by him. Father was ready, willing, and able to care for his children. The State contended, "It is my position that the father has not proven he's ready, willing, and able and the Court made the appropriate decision based on the evidence at the time of the dispositional hearing." Mother agreed there was a presumption of fitness but argued it was not the only issue and contended, "The Court has to make a finding that there's no reason to make the children wards of the Court." The GAL stated, "[A]t this time I agree with the State and [Mother's attorney]. I think the Court made the right decision at the time." The GAL continued, stating, "One of [the children] was a kind of special medical needs, and I just think oversight is a good thing. I think they're doing well at dad's house, but I think the Court made the right ruling on behalf of the kids." Father concluded the argument by noting that both the State and GAL recommended custody and guardianship to Father at the dispositional hearing and stating the court's prior determination was a misapplication of law. At no time did the State explain its changed position or advise the trial court of DCFS's updated report.

¶ 19    Following argument, the trial court found:

"The father had visited with the children on major holidays and summer months. Therefore, at least, according to the only evidence I was provided during the dispositional hearing, the father visited three, maybe four times per year, which is inconsistent with his child support payments.

So [he's] not really supporting his children financially as he should be or visiting them as he should be. Meanwhile one of his children received a broken femur [*sic*] while in mother's care. When they were transferred to father's care, even thee [*sic*] one of the children had a serious medical condition, he wasn't as

8

prompt as he should have been about getting [O.W.] to the doctor for a serious medical condition.

I asked what the argument would be had the roles been switched, and it was a mother who rarely visited her children or rarely supported them or didn't take the children to the doctor. The Court submits that it would be a no-brainer, that the argument would be that she's unfit.

So, it appears the children are doing okay in father's care. I also emphasize the concern that I had at the dispositional hearing. Obviously, the hands on and eyes on care and attention that children received during the COVID-19 pandemic and restrictions has been limited. But, as far as I could tell, according to the dispositional report, the only contact was by [DCFS], a parallel from La Salle County, and the only indication was no safety concerns noted, which tells the Court nothing really about how the children are doing.

In addition to that, if the Appellate Court wants to consider this, however in the States, the worst—the supervisor or this office being the worst in the county, but as a system we are dead last. I don't know who these La Salle County DCFS workers are and how competent they are, but I do know that on numerous occasions the Court is concerned about the supervision that children get when they are in the care of both DCFS and private agencies. Recently, two DCFS caseworkers up north, not too far from La Salle County were charged criminally for neglecting their children who were in their care.

So, this is the status of the child welfare system in the State of Illinois, and the Court will take every precaution that it has available to us, and if the Appellate

9

Court disagrees with that from a legal standpoint, then obviously they can overturn me. But at least that will be several more months these kids are supervised. Your motion to reconsider is denied."

¶ 20 Father appealed the judgments, and we consolidated the cases.[3] Pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), our disposition of this appeal was due February 25, 2021. However, due to consolidation of these appeals and a motion to amend the appellant's brief, this case was not fully briefed until December 22, 2020. It was immediately placed on the next available docket for February 16, 2021. Thus we find good cause to issue this disposition beyond the deadline.

¶ 21                                ANALYSIS

¶ 22 "A proceeding for adjudication of wardship represents a significant intrusion into the sanctity of the family, which should not be undertaken lightly." (Internal quotation marks omitted.) *In re A.P.*, 2012 IL 113875, ¶ 18. Therefore, "[t]he Act sets forth the procedures that must be followed in determining whether a minor should be removed from his or her parents' custody and be made a ward of the court." *In re M.M.*, 2016 IL 119932, ¶ 17. "A trial court must employ, pursuant to the Act, a two-step process to decide whether a minor should become a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 18.

¶ 23 Step one is the adjudicatory hearing, which determines whether the minor is abused or neglected because adverse conditions exist. 705 ILCS 405/2-21 (West 2018); *In re Arthur H.*, 212 Ill. 2d 441, 465-66 (2004). This step is not at issue, as Mother admitted that two of her four minor children, one of which was L.W., suffered broken tibias in less than a week without any obvious explanation as to how the injuries occurred while in Mother's care. The trial court's adjudicatory

_____

[3]The children's mother did not participate in this appeal.

10

order found the minor children were abused or neglected as defined by section 2-3 of the Act in that the minors were in an environment injurious to the welfare of the children as defined by section 2-3(1)(b) of the Act. No appeal was taken from that ruling.

¶ 24    The second step requires the trial court to hold a dispositional hearing, in which the court must first determine "whether it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." 705 ILCS 405/2-21(2), 2-22(1) (West 2020); *In re M.M.*, 2016 IL 119932, ¶ 17. If a minor is made a ward of the court, "the court shall determine the proper disposition best serving the health, safety and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2018); *In re M.M.*, 2016 IL 119932, ¶ 18. The Act provides:

> "four basic types of dispositional orders with respect to a ward of the court. The minor may be (1) continued in the care of the minor's parent, guardian, or legal guardian; (2) restored to the custody of the minor's parent, guardian, or legal custodian; (3) ordered partially or completely emancipated; or (4) 'placed in accordance' with section 2-27 of the Act." *In re M.M.*, 2016 IL 119932, ¶ 18.

See also 705 ILCS 405/2-23(1)(a) (West 2018).

¶ 25    Section 2-27 provides in relevant part:

> "(1) If the court determines and puts in writing the factual basis supporting the determination of whether the parents, guardian, or legal custodian of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian, the court may at this hearing and at any later point:

11

*** *

(d) *** commit the minor to the Department of Children and Family Services for care and service ***." 705 ILCS 405/2-27(1) (West 2018).

¶ 26    "[T]he choice of dispositional order rests within the sound discretion of the trial court" (*In re J.S.*, 151 Ill. App. 3d 884, 887 (1987)) and "will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." (Internal quotation marks omitted.) *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 41. "A determination will be found to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence presented [citation]." *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 27    The trial court's dispositional order found it was "consistent with the health, welfare, and safety of the minor and in the best interest of the minor to make the minor a ward of the Court" and that Father was, "[f]or reasons other than financial circumstances alone, unable to care for, protect, train, educate, supervise, or discipline the minor child and placement with him is contrary to the health, safety and best interests of the minor because: [blank]." No factual basis for the finding was provided in the order.

¶ 28    On appeal, Father argues the trial court erred by failing to include a written factual basis for its findings pursuant to section 2-27(1) of the Act (705 ILCS 405/2-27(1) (West 2018)). However, our supreme court previously held "that an oral finding on the record may satisfy section 2-27(1), provided that it is explicit and advises the parties of the basis for the court's decision." *In re Madison H.*, 215 Ill. 2d 364, 377 (2005). Consequently, the relevant issues are whether the trial court's oral findings were sufficiently explicit to advise Father of the basis of the trial court's

12

decision and, if so, whether those dispositional findings were against the manifest weight of the evidence. *In re K.B.*, 2012 IL App (3d) 110655, ¶ 23.

¶ 29    The trial court's oral findings about Father were that he had inconsistent visitation since moving, was inconsistent with paying child support, and failed to take one of the minor children to a doctor's appointment. We find the basis was sufficiently explicit and therefore must only determine if the findings were against the manifest weight of the evidence.

¶ 30    We note that Father moved to Mendota, Illinois, which the record established was four hours away from Mother's home, in October 2019, and DCFS became involved in January 2020. While the trial court claimed Father only "visited with the children on major holidays and summer months" and, therefore, "visited three, maybe four times per year," the pertinent time period was only four months and did not include "summer months." The record revealed Father had visitation with his children every weekend and occasionally during the week prior to his move. Mother also advised DCFS that Father also had the children for two or three weeks just prior to moving. After the move, based on Mother's testimony, Father saw the children every other weekend or every third weekend, which equates to six or eight visitations during the four-month period. Further, Father had extended visitation over Christmas break in 2019. The record does not comport with the trial court's finding that Father was not "visiting them as he should be," especially given the fact that there was no court-ordered visitation period and Father continued to visit with his children even though he lived four hours away. For these reasons, we find the trial court's findings related to visitation were against the manifest weight of the evidence.

¶ 31    The trial court's findings regarding the missed doctor's appointment were also unsupported. The record revealed that L.W.'s original appointment, scheduled in April 2020, was canceled due to COVID-19. A second appointment was scheduled by "Adam" at Cardinal Glennon

13

once the hospital began scheduling regular intake appointments. However, Mother admitted she never personally advised Father of the rescheduled appointment. More importantly, the September 28, 2020 DCFS report, filed prior to the reconsideration hearing, specifically noted Father took L.W. for his echocardiogram on September 21, 2020. At that time, L.W. was examined by Dr. Fulton, who later advised DCFS of no concerns regarding the health and well-being of L.W. and further advised DCFS that a follow-up visit with a cardiologist was scheduled for December 4, 2020, to ensure all exams and tests were normal. For these reasons, we find the trial court's findings related to the missed doctor's appointment were against the manifest weight of the evidence.

¶ 32    Finally, the trial court's reliance on child support was erroneous, as section 2-27(1) requires the finding to encompass "some reason other than financial circumstances alone." 705 ILCS 405/2-27(1) (West 2018). The record revealed that Father's voluntary child support payments were inconsistent due to Father's job changes or loss of employment. There was no testimony that Father had the financial ability to continue making his voluntary support payments but nevertheless declined to do so. Therefore, any inconsistent child support payments appear to be based on "financial circumstances." As this is the only remaining basis to find Father was unable to care for his children, the basis is insufficient, as a matter of law.

¶ 33    The trial court's remaining findings, noted during both the dispositional and the reconsideration hearings, were directed to DCFS, or more specifically, the alleged lack of information provided by DCFS. However, the burden of proof at a dispositional hearing is on the party requesting a finding that a parent is unable to care for, protect, train, or discipline a child. *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23. That party must establish the parent's inability by a preponderance of the evidence. *Id.* In the case at bar, at the dispositional hearing, the State, DCFS, and the GAL recommended Father be granted custody and guardianship of the minor

14

children. Mother disagreed. Therefore, the burden of proof did not lie with DCFS but with Mother. While the trial court's concern for the minor children is commended, and we recognize the trial court's frustration with the perceived lack of information,[4] the language and underlying purpose of the Act cannot be ignored.

¶ 34 Section 1-2 of the Act provides that the purpose of the Act is "to preserve and strengthen the minor's family ties whenever possible, removing him or her from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1-2(1) (West 2018). " '[T]he preferred result under the Juvenile Court Act is that a child remain in his or her home, in the custody of his or her parents. This is a clarification of the child's best interests.' " *In re M.M.*, 2016 IL 119932, ¶ 23 (quoting *In re R.C.*, 195 Ill. 2d 291, 308 (2001)). "[P]arents have an inherent right to the society and custody of their children which should not be abrogated except for the most compelling of reasons." *In re Prough*, 61 Ill. App. 3d 227, 232 (1978).

¶ 35 We find that Mother failed to establish that Father was unable to care for the children, as there was no evidence, to say nothing of compelling evidence, showing that granting custody and guardianship to Father would be injurious, in any way, to the children. Therefore, the trial court's dispositional order, granting custody and guardianship to DCFS, was an abuse of discretion.

¶ 36         CONCLUSION

¶ 37 For the foregoing reasons, we vacate the Marion County circuit court's findings and dispositional order and remand for proceedings in accordance with this opinion.

¶ 38 Reversed.

---

[4]Although unnecessary in this case, the preferred course would be to "adjourn the hearing for a reasonable period to receive reports or other evidence, if the adjournment is consistent with the health, safety and best interests of the minor," so long as the dispositional hearing occurs within six months from the initial removal. 705 ILCS 405/2-22(4) (West 2018).

## No. 5-20-0311

| | |
|---|---|
| **Cite as:** | *In re L.W.*, 2021 IL App (5th) 200311 |
| **Decision Under Review:** | Appeal from the Circuit Court of Marion County, Nos. 20-JA-18, 20-JA-19; the Hon. Ericka A. Sanders and the Hon. Mark W. Stedelin, Judges, presiding. |
| **Attorney for Appellant:** | Alexander M. Fine, of Fine Law LLC, of Centralia, for appellant. |
| **Attorneys for Appellee:** | Tim Hudspeth, State's Attorney, of Salem (Patrick Delfino, Patrick D. Daly, and Julia Kaye Wykoff, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |