2022 IL App (1st) 220018-U

FOURTH DIVISION
July 7, 2022

No. 1-22-0018

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT
OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* L.M., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 19 JA 308 |
| v. | ) | |
| | ) | |
| L.T.-M., | ) | Honorable |
| | ) | John L. Huff, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE REYES delivered the judgment of the court.
Justices Rochford and Martin concurred in the judgment.

**ORDER**

¶ 1     *Held*: Affirming the judgment of the circuit court finding the natural mother unable to care for, protect, train, or discipline her son and placing him with his natural father.

¶ 2     Respondent L.T.-M., the natural mother of minor L.M., appeals from a judgment of the circuit court of Cook County finding her unable to care for, protect, train, or discipline L.M. and placing L.M. with his natural father, E.M.  The State, the Cook County Public Guardian, and E.M. challenge her contentions.  For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4                      *Petition for Adjudication of Wardship*

¶ 5      In April 2019, the State filed a petition for adjudication of wardship as to L.M. (born in 2010), alleging that L.M. was abused and neglected as defined in section 2-3 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2020)) due to an injurious environment (*id.* § 2-3(1)(b)) and a substantial risk of physical injury (*id.* § 2-3(2)(ii)). The petition alleged that L.M.'s half-sister B.T.[1] was observed with a periorbital hematoma, *i.e.*, a black eye, in January 2019. B.T. stated that respondent injured her by repeatedly hitting her in the face with a cellphone. Medical personnel opined that B.T.'s injury was consistent with her explanation. Respondent admitted throwing a cellphone at B.T.

¶ 6      An intact case was opened, and a safety plan was put in place for the family. According to the petition, respondent failed to attend multiple meetings and family sessions regarding B.T. Respondent also violated the terms of the safety plan by being unsupervised with L.M. Both children reported that they feared respondent and did not want to return to her care.

¶ 7      The circuit court granted temporary custody of L.M. to the guardianship administrator of the Illinois Department of Children and Family Services (DCFS). The Public Guardian was appointed as the attorney and guardian *ad litem* for L.M., and attorneys were appointed to represent L.M.'s parents: respondent and E.M. The case proceeded to an adjudicatory hearing.

¶ 8                      *Adjudicatory Hearing and Order*

¶ 9      The testimony at the adjudicatory hearing included the following. Hannah McCarthy (McCarthy), a social worker at B.T.'s high school, contacted DCFS after observing discoloration

---

[1] L.M. and B.T. have different fathers; both fathers were non-custodial during the relevant time period. Although the State also filed a petition for adjudication of wardship as to B.T. (19 JA 307) – and the two cases appear to have proceeded jointly in the circuit court – the instant appeal is limited to L.M.

below B.T.'s eye. McCarthy testified that B.T. told her that respondent struck her with a cellphone based on respondent's belief that B.T. had inappropriately touched respondent's paramour. B.T. reported to McCarthy that respondent had stated she "was going to kill [B.T.]."

¶ 10   Enoe Napoles (Napoles), a child protection specialist for DCFS assigned to the case, testified that respondent had one prior indicated report.[2] During an interview, respondent denied hitting B.T. but admitted throwing a cellphone at her. When interviewing B.T., Napoles observed a bump on her forehead, swelling on the bridge of her nose, and light bruising beneath her eye. B.T. stated that she had missed more than a week of school after respondent punched her in the lip and repeatedly struck her with a cellphone. B.T. told Napoles that respondent had been upset, as she believed that B.T. had hit respondent's paramour's "private area." Napoles testified that B.T. indicated that respondent drank wine and smoked cannabis. According to Napoles, B.T. asked to be placed with her father.

¶ 11   Napoles testified that she also interviewed L.M. He displayed no visible signs of abuse or neglect and did not report any concerns. Napoles visited the apartment where E.M. resided with his mother (L.M.'s grandmother); the apartment was found to be safe and appropriate.

¶ 12   Elizabeth Ramirez (Ramirez), the intact worker assigned to investigate this case, interviewed respondent in February 2019. Ramirez testified that certain services were recommended for respondent, *e.g.*, parenting classes and a mental health assessment and counseling. When Ramirez subsequently confirmed that respondent had not yet attended her mental health assessment, respondent became upset and stated she would "cuss everybody out."

¶ 13   Ramirez also testified regarding her interviews of L.M. and B.T. in March 2019. L.M. reported that respondent had taken him to an indoor trampoline park for his birthday by herself –

---

[2] One of respondent's older children, C.B., was previously found to be abused and neglected.

a violation of the safety plan. L.M. also told Ramirez that respondent frequently physically punished B.T. L.M. stated that he was physically punished by respondent as well, but less often than his sister. Ramirez testified that B.T. was psychiatrically hospitalized after threatening to commit arson.

¶ 14 Respondent testified that her daughter B.T. rubbed her eyes due to allergies and sleep apnea, which caused a "brush burn" near her eye. Respondent also testified B.T. had been sick in January 2019 and missed a few days of school. Although respondent acknowledged that she "tossed" a cellphone, she denied causing any bruising, and she characterized B.T. as "dramatic." She denied ever physically punishing her son L.M. or violating the safety plan by taking him to a trampoline park on his birthday.

¶ 15 B.T.'s paternal grandmother, A.R., testified that she never noticed a bruise or other sign of abuse on B.T. A.R. suggested that B.T. was not truthful.

¶ 16 After closing arguments, the circuit court entered an adjudication order in December 2019, finding L.M. was abused and neglected as defined in section 2-3 of the Act (705 ILCS 405/2-3 (West 2020)) due to an injurious environment (*id.* § 2-3(1)(b)) and a substantial risk of physical injury (*id.* § 2-3(2)(ii)) based on respondent's abuse of B.T. The case eventually proceeded to a multi-day dispositional hearing, wherein the testimony and other evidence included the following.

¶ 17                         *Dispositional Hearing – July 16, 2021*

¶ 18 During the initial hearing on July 16, 2021, Cordelia Harris (Harris), a DCFS case manager, testified that L.M. was placed with his paternal grandmother, D.S., in April 2019. E.M. also resided with D.S. Harris reported that D.S.'s home was safe and appropriate, and L.M. displayed no signs of abuse or neglect. Harris testified that L.M. was doing well in occupational,

physical, and speech therapy, and his grades were good. According to Harris, E.M. was required to participate in family counseling with L.M. Approximately once a month, Harris observed interactions between L.M. and E.M., which she characterized as appropriate.

¶ 19    Although respondent participated in telephonic and FaceTime calls with L.M., she did not have many supervised in-person visits due to her behavior. Harris reported that respondent had participated in individual counseling and had completed parenting classes; respondent was also required to submit to toxicology screenings, commonly referred to as "drops."

¶ 20    Harris testified that DCFS recommended L.M.'s placement with E.M. – which aligned with the wishes of both L.M. and E.M. and was supported by D.S. Harris opined that E.M. and respondent would be able to agree upon a visitation schedule.

¶ 21    Daniella Macrito (Macrito), a case manager at Maryville (Maryville), a residential treatment center, testified that B.T. had been residing at Maryville for more than seven months. According to Macrito, respondent participated consistently in supervised visitation with B.T. except for the prior two weeks. Macrito testified there were no concerns regarding the visitation.

¶ 22    Respondent testified that she wanted her children returned to her care, although she acknowledged that B.T. needed additional treatment. Respondent admitted that she "[broke] a lot of the rules," *e.g.*, by going to D.S.'s home to help L.M. with his homework. According to respondent, L.M. wanted to return to her home but was concerned about hurting his father and grandmother. Respondent represented that E.M. was her former husband and that they separated in 2013 and divorced in 2020.[3] Respondent claimed that she was awarded custody of L.M. in the divorce decree. She also testified that L.M. had spent time at D.S.'s home throughout his life.

¶ 23    Keith Conway (Conway), respondent's therapist, testified that respondent had made

---

[3] At a subsequent hearing, respondent clarified that her divorce from E.M. was finalized in 2019.

progress during her 10 months of therapy, *e.g.*, she demonstrated the ability to express her feelings and to moderate her temperament. Conway's agency did not recommend any further individual therapy for respondent at that time.

¶ 24    The circuit court stated that it was impressed with both respondent and E.M. and that both appeared to be devoted parents. The circuit court, however, continued the hearing to determine whether respondent and E.M.'s divorce decree already addressed custody issues.

¶ 25                    *Continued Dispositional Hearing – July 21, 2021*

¶ 26    The divorce decree and related transcripts – which were submitted by the State at the continued dispositional hearing on July 21, 2021 – revealed certain inaccuracies in respondent's prior testimony, *i.e.*, respondent had represented to the domestic relations court that she and E.M. did not have children together. When recalled to the stand, respondent testified that she did not pursue child custody in the divorce proceedings, as E.M. was largely absent from L.M.'s life at that time. She maintained that she was best positioned to supervise and motivate her son, given D.S.'s advanced age and E.M.'s busy work schedule. Respondent further testified that L.M. expressed daily that he wished to return to her home.

¶ 27    During cross-examination, respondent acknowledged that E.M.'s paternity had been established through DNA testing in the instant proceedings in 2019, yet she subsequently represented to the domestic relations court that she and E.M. did not have any children. Respondent suggested, however, that she had been uncertain if E.M. was L.M.'s biological father at that time, as he had previously denied paternity.

¶ 28    Beverly Mims Taylor (Mims Taylor), a DCFS supervisor assigned to L.M.'s case, was called as an impeachment witness. Mims Taylor testified that E.M. had been assessed for substance usage and had received a referral for family therapy. She testified that DCFS

concluded that E.M. was able to safely parent L.M.

¶ 29    As to respondent, DCFS did not believe she was able to parent L.M. at that time. Mims Taylor testified that respondent had not completed all of the recommended services, and DCFS had concerns regarding her anger. According to Mims Taylor, respondent's outbursts of anger had negatively affected the ability of DCFS staff members to assess her parenting. Although respondent had expressed concerns during her testimony regarding L.M. always being outside, Mims Taylor had never received any report that L.M. was being improperly supervised.

¶ 30                    *Continued Dispositional Hearing – December 9, 2021*

¶ 31    At the continued dispositional hearing on December 9, 2021, DCFS case manager Cordelia Harris provided updated testimony. Harris testified that respondent had completed parenting classes. Although respondent's individual therapy was discontinued after her therapist's departure from the agency, DCFS recommended that such therapy continue and that she receive a certificate of completion.

¶ 32    Harris also testified that respondent provided biweekly drops; respondent tested positive for marijuana in September 2021. Shortly before the December hearing, respondent missed a scheduled drop, although she claimed that the drop location had closed early on that date.

¶ 33    According to Harris, DCFS was concerned that respondent may have mental health issues. Harris testified that respondent's supervised visits with DCFS were previously discontinued based on her disrespectful behavior toward the transportation agencies, *e.g.*, threatening and insulting the staff members.

¶ 34    When E.M. and D.S. agreed to supervise respondent's visits with L.M., respondent continued to engage in inappropriate behavior. On one occasion in June 2021, D.S. arrived home to find respondent bathing in D.S.'s bathtub. When confronted by D.S., respondent cursed

at her. On another occasion in August 2021, respondent observed L.M. on the street in the afternoon, picked him up unsupervised, and did not return him to D.S. until almost midnight. During an argument in front of L.M. in September 2021, respondent broke the knob on D.S.'s door. Although respondent previously completed a mental health assessment, Harris testified that DCFS recommended that respondent undergo another psychological assessment.

¶ 35    As to E.M., Harris testified that he had a long history of employment and had planned on continuing to reside with D.S. for the indefinite future. According to Harris, E.M. had unsupervised overnight visits with L.M. During cross-examination, Harris testified that E.M. had stated that he had a pending driving under the influence (DUI) case from 2020. According to Harris, E.M. "went to court for that and he says that would be removed."

¶ 36    Respondent provided additional testimony. She testified that L.M. was not involved in any activities, and she expressed concern that he played outside and crossed busy streets without supervision. According to respondent, E.M. told L.M. that he was "too big" for Christmas and birthdays and that L.M. should start engaging in sexual activity with girls.

¶ 37    At the conclusion of the dispositional hearing, the circuit court found that respondent's testimony was not credible, noting that she had admitted that she had previously lied under oath. The circuit court found Harris's testimony to be credible. In a written order entered on December 9, 2021, the circuit court found that respondent was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline L.M. The circuit court found that E.M. was fit, able, and willing to care for, protect, train, and discipline L.M.; he was granted custody of L.M. The circuit court also entered an order of protection pursuant to sections 2-24 and 2-25 of the Act (705 ILCS 405/2-24, 2-25 (West 2020)) which delineated the terms and conditions of the protective supervision. Respondent timely filed a notice of appeal.

¶ 38                                     ANALYSIS

¶ 39     Prior to addressing respondent's contentions on appeal, we address the timeliness of our

decision.  The instant appeal is designated as accelerated pursuant to Illinois Supreme Court Rule

311(a) (eff. July 1, 2018).  Rule 311(a)(5) provides that "[e]xcept for good cause shown," the

appellate court shall issue its decision within 150 days after the filing of the notice of appeal.  *Id.*

The 150-day period herein expired on June 3, 2022.  We note, however, that each of the parties

requested (and was granted) an extension of time for filing a brief.  The three appellee briefs –

from the State, the Public Guardian, and E.M. – were filed in May 2022.  Respondent's counsel

informed our clerk's office on June 3, 2022, that a reply brief would not be filed.  As the case

was not ready for disposition until June 2022, we find good cause for issuing our decision after

the 150-day deadline.  *E.g.*, *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 26.

¶ 40     Turning to the merits, respondent advances two primary arguments on appeal.  She

initially contends that the circuit court's finding that she was unable to care for, protect, train, or

discipline L.M. was against the manifest weight of the evidence.  Respondent also argues that the

circuit court's decision to place L.M. with his father E.M., based on a finding that E.M. was fit,

able, and willing to care for his son, was against the manifest weight of the evidence.  The State,

Public Guardian, and E.M. challenge her contentions.  We begin with a brief review of the Act.

¶ 41                     *Legal Framework and Standard of Review*

¶ 42     The Act sets forth the two-step process that the circuit court must follow in determining

whether a minor should be removed from his parents' custody and made a ward of the court.  *In

re Z.L.*, 2021 IL 126931, ¶ 58.  The first step is the adjudicatory hearing, wherein the court

considers only the question of whether the minor is abused, neglected, or dependent.  *Id.* ¶ 59.

¶ 43     If the circuit court determines that a minor is abused or neglected at the adjudicatory

hearing, the court then moves to the second step, which is the dispositional hearing. *Id.* ¶ 60, citing 705 ILCS 405/2-21(2) (West 2018). "At the dispositional hearing, the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court." *Id.* In any proceeding under the Act, the paramount consideration is the best interest of the child. *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). See also *In re Desiree O.*, 381 Ill. App. 3d 854, 865 (2008) (noting that the "health, safety and interests of the minor remain the guiding principle when issuing an order of disposition regarding the custody and guardianship of a minor ward").

¶ 44 The burden of proof at a dispositional hearing is on the party requesting a finding that a parent is unable to care for, protect, train, or discipline a child. *In re Daniel G.*, 2021 IL App (1st) 210640, ¶ 58. The movant must establish the parent's inability by a preponderance of the evidence. *Id.* See also *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 43.

¶ 45 The choice of a dispositional order rests within the sound discretion of the circuit court. *In re L.W.*, 2021 IL App (5th) 200311, ¶ 26. A dispositional order will be reversed "only if the factual findings at the dispositional hearing are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order." *Daniel G.*, 2021 IL App (1st) 210640, ¶ 54. A finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or if the finding itself is arbitrary, unreasonable, or not based on the evidence presented. *Id.* "Ultimately, there is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re William H.*, 407 Ill. App. 3d 858, 866 (2011) (citing *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005)).

¶ 46 As respondent makes no arguments in her appellate brief regarding the circuit court's findings at the adjudicatory hearing, we consider herein only the findings at the dispositional

hearing.  *E.g.*, *Jennifer W.*, 2014 IL App (1st) 140984, ¶ 41.  See also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (providing that "[p]oints not argued are forfeited").

¶ 47                    *Finding that Respondent was Unable to Care for L.M.*

¶ 48    Respondent contends that the circuit court's finding that she was unable to care for, protect, train, or discipline L.M. was against the manifest weight of the evidence, as she had completed all of the services recommended by DCFS.  As discussed below, we reject this contention.  The evidence suggests that respondent did not complete all recommended services. Furthermore, even assuming her compliance, a reversal is not warranted where the record otherwise supports the circuit court's determination that she was unable to care for L.M.

¶ 49    Respondent accurately observes that she completed parenting classes and a psychiatric evaluation.  Harris testified, however, that DCFS recommended that respondent undergo another psychological assessment.  Respondent also notes that her therapist Keith Conway testified that he was under the impression that "once we're done with court, basically, her therapy goals are reached."  A written summary from the counseling agency, however, expressly stated that the reason for the termination of respondent's therapy was that the "[t]herapist no longer works for the [a]gency" – not that the treatment was completed.  Citing *In re Daniel G.*, 2021 IL App (1st) 210640, respondent suggests that the circuit court improperly speculated regarding what future services may be recommended by DCFS.  We disagree.  The evidence presented at the dispositional hearing made clear that DCFS had continuing (and legitimate) concerns based on respondent's prior conduct and had recommended additional therapy and periodic drops.

¶ 50     In any event, respondent's participation in recommended services is not dispositive. See *In re M.B.*, 332 Ill. App. 3d 996, 1006 (2002) (noting that "[t]he fact a parent exhibits compliance with recommended services and a willingness to be a good parent is not dispositive

and has been held not to warrant reversal of [an] unfitness or inability finding where the record contains evidence otherwise supporting the circuit court's determination"). See also *In re Stephen K.*, 373 Ill. App. 3d 7, 26 (2007) (observing that the court "was not limited only to considering the respondent's compliance with DCFS service plans"); *In re Kamesha J.*, 364 Ill. App. 3d 785, 796 (2006) (stating that "[a]lthough respondent did participate in some recommended services, that fact does not mean that a disposition other than the one entered by the trial court would be in the best interests of the children").

¶ 51 In the instant case, there is ample support for the circuit court's finding that respondent was unable to care for, protect, train, or discipline L.M. Despite the fact that she was never granted unsupervised visitation with L.M., respondent admittedly "[broke] a lot of the rules" to visit him, including taking him without permission and unsupervised and returning him at midnight. The testimony indicates that respondent's anger issues negatively affected the ability of DCFS and its agents to assess her or to transport her to visits. She engaged in certain erratic behavior, including entering D.S.'s residence, bathing in her tub without permission, and becoming angry when confronted about her behavior. While most of her drops were negative, respondent tested positive for marijuana in September 2021, and she missed a drop before the hearing.

¶ 52 Based on our review of the record, it appears that the circuit court "conscientiously took into account all of the evidence presented at the dispositional hearing." *Z.L.*, 2021 IL 126931, ¶ 96. The circuit court's finding that respondent was unable to care for, protect, train, or discipline L.M. was not against the manifest weight of the evidence. *E.g.*, *Jennifer W.*, 2014 IL App (1st) 140984, ¶ 45.

¶ 53    *Finding that E.M. was Fit, Able, and Willing to Care for L.M.*

¶ 54    Respondent also contends that the decision to place L.M. in the custody of his father E.M. was against the manifest weight of the evidence.  As an initial matter, we note that the parties disagree regarding which party bore the burden of proof at the dispositional hearing with respect to E.M.  Respondent asserts that she bore the burden of proving that E.M. was unable to care for, protect, train, or discipline L.M.  *E.g.*, *L.W.*, 2021 IL App (5th) 200311, ¶ 33 (noting that the burden of proof at a dispositional hearing is on the party requesting a finding that a parent is unable to care for, protect, train, or discipline a child); *In re Kelvion V.*, 2014 IL App (1st) 140965, ¶ 23 (same).  Conversely, the State contends that "at no point in the proceedings did respondent argue that [E.M.] was unable to parent, and therefore the burden was always on the [State] to show who was able to parent the minor."  The Public Guardian agrees with the State, noting that the dispositional hearing stemmed from the petition for adjudication of wardship, which was filed by the State.  We need not resolve this issue, however, as the record clearly supports the circuit court's determination.

¶ 55    The evidence at the dispositional hearing established that E.M. had unsupervised overnight visits with L.M. at D.S.'s home throughout the proceedings.  D.S.'s home – where E.M. intended to continue to reside for the indefinite future – was found to be safe.  DCFS staff periodically observed E.M.'s interactions with L.M. and found such interactions to be appropriate.  According to DCFS staff, L.M. had expressed his desire to be placed with E.M.  Although E.M. apparently had a pending DUI case at the time of the dispositional hearing, DCFS representatives did not express any concern regarding E.M.'s ability to care for and protect L.M.

¶ 56    The sole witness who raised concerns regarding E.M.'s parenting ability was respondent.  The circuit court, however, expressly found respondent's testimony to be lacking in credibility

based on, among other things, her documented misrepresentations in court proceedings. Conversely, the circuit court found Harris's testimony – which supported L.M.'s placement with E.M. – to be credible. "The circuit court was in the best position to determine the credibility and weight of the witnesses' testimony and to resolve conflicts in their testimony because the circuit court had the opportunity to observe their demeanor and conduct." *In re A.P.*, 179 Ill. 2d 184, 204 (1997). See also *Daniel G.*, 2021 IL App (1st) 210640, ¶ 71 (noting that the only individual who questioned the father's ability to care for the minor was the mother, whose own actions caused the minor to be adjudged a neglected minor and a ward of the court).

¶ 57    As our supreme court has observed, "[i]t is apparent that the preferred result under the [Act] is that a child remain in his or her home, in the custody of his or her parents." *In re R.C.*, 195 Ill. 2d 291, 308 (2001). Based on our review of the record, we cannot find that the circuit court's decision to grant custody of L.M. to his father E.M. was in error.

¶ 58                                    CONCLUSION

¶ 59    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 60    Affirmed.