2022 IL App (1st) 210420-U

No. 1-21-0420

Order filed February 24, 2022

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF: | ) | Appeal from the |
| Iris B.-P., | ) | Circuit Court of |
|     Minor-Respondent-Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
|     and | ) | |
| | ) | No. 19 JA 932 |
| Christopher P., | ) | |
|     Father-Respondent-Appellee, | ) | |
| | ) | |
|     v. | ) | |
| | ) | Honorable |
| Rebecca B., | ) | Demetrios Kottaras, |
|     Mother-Respondent-Appellant.) | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's adjudicatory and dispositional findings were not against the manifest weight of the evidence.

¶ 2    Respondent-appellant, Rebecca B. (Rebecca), challenges the trial court's adjudicatory order finding that her minor daughter Iris B.-P. (Iris), was abused and neglected based on lack of

1

care and injurious environment pursuant to corresponding sections of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (lack of care), (1-b) (injurious environment) (West 2018)). The court's findings were based on its determination that the State had proven, by a preponderance of the evidence, that Iris was a victim of medical child abuse instigated by her mother. "Medical child abuse occurs when a child receives unnecessary and harmful or potentially harmful medical care at the instigation of a caretaker, wherein the caretaker is most likely the mother of the child."[1] In this case, evidence was presented that Rebecca caused Iris to be subjected to multiple and unnecessary forensic interviews and medical exams as a result of her unfounded allegations of child sexual abuse against the biological father Christopher P. (Christopher). For the reasons that follow, we affirm.[2]

¶ 3      We initially note that this appeal was accelerated under Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision in an accelerated case within 150 days of the filing of the notice of appeal. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Here, Rebecca filed her notice of appeal on April 15, 2021. Thus, the record on appeal was due in this court on May 20, 2021, and our disposition was due on September 13, 2021. See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018). On May 19, 2021, Rebecca's counsel moved for an extension of time to file the record, requesting an extension to June 25, 2021. On June 28, 2021, Rebecca's counsel filed the first of three motions for extension of time to file the appellant brief. Several motions regarding impounded evidence and supplements to the record were filed thereafter. In late October of 2021, appellees' counsel filed their first of

---

[1]Tiffany S. Allison, *Proving Medical Child Abuse: The Time is Now for Ohio to Focus on the Victim and not the Abuser, 25 Journal of Law and Health*, 191, 192 (2012) (Internal citations and quotations omitted.)

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon entry of a separate written order.

two motions for extension of time to file the appellee brief. Thereafter, on December 21, 2021, Rebecca's counsel filed a motion for extension of time to file her reply brief. The reply brief was filed on January 26, 2022. We find these reasons to constitute good cause for this decision to be issued after the timeframe mandated in Rule 311(a).

¶ 4                                    I. BACKGROUND

¶ 5      This case arises against the backdrop of a contentious and ongoing divorce action between Rebecca and Christopher. Iris was born May 25, 2012. Her parents married December 2013 and separated September 2016. Shortly after their separation, Rebecca commenced divorce proceedings in the circuit court of Cook County.

¶ 6      On May 2, 2019, Rebecca made a hotline call to the Illinois Department of Children and Family Services (DCFS) reporting that Christopher had sexually abused Iris during a supervised visit. The call was the latest in a series of hotline calls placed to DCFS over the years, with the first call occurring in August 2016, a month before the couple separated. DCFS investigated each of the prior hotline calls and determined them unfounded.

¶ 7      On August 23, 2019, the State filed a petition for adjudication of wardship alleging that Iris was abused and neglected based on lack of care, injurious environment, and substantial risk of physical injury pursuant to applicable sections of the Juvenile Court Act. See 705 ILCS 405/2-3(1)(a) (lack of care), (1-b) (injurious environment), and (2)(ii) (substantial risk of physical injury) (West 2018).[3] The allegations were based on the following facts:

> "Mother has repeatedly made false allegations that father is sexually abusing this minor. Mother has subjected minor to multiple, unnecessary forensic interviews and medical exams. Per medical personnel, minor is being coached by mother. Medical personnel have

_____

[3]The State's petition prompted the domestic relations court to stay ongoing proceedings in the divorce action.

3

diagnosed minor with medical child abuse. Mother refused intact services. Per current court order, father is only allowed supervised visitation with minor."

¶ 8     The State also filed a motion for temporary custody. In the motion, the State alleged that reasonable efforts could not prevent or eliminate the necessity of removing Iris from her mother's home. The motion was supported by an affidavit from Division of Child Protection (DCP) investigator Donna Morrison. Morrison averred that the case came to the attention of DCFS as a result of "[m]ultiple reports of sexual abuse against father which have all been unfounded and the Medical child abuse by mother." Morrison went on to say that Iris had been subjected to excessive and unnecessary forensic interviews and medical examinations. She further averred that Rebecca had refused services and that Iris was at risk of harm.

¶ 9     At the ensuing temporary custody hearing, the trial court received into evidence a "Multidisciplinary Pediatric Education and Evaluation Consortium" (MPEEC) report. MPEEC is a DCFS-funded consortium of pediatricians who specialize in child abuse and, among other things, resolve conflicting medical opinions concerning such abuse.[4] The MPEEC report in this case was authored by Dr. Jill Glick, a professor of pediatrics at the University of Chicago Medical Center and medical director of the child advocacy and protective services team at the center.

¶ 10    In her MPEEC report, Dr. Glick opined that there was compelling evidence that Rebecca was coaching Iris to make false allegations of sexual abuse against Christopher. The report noted that Christopher willingly took and passed a polygraph examination regarding the allegations of child sexual abuse. Dr. Glick diagnosed Iris as a victim of medical child abuse resulting from "unnecessary child sexual abuse evaluations" and identified Rebecca as the perpetrator.

¶ 11    On August 23, 2019, the trial court entered a temporary custody order pursuant to section

---

[4]*Hernandez v. Foster*, 657 F.3d 463, 471 (7th Cir. 2011); *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 17 n. 1.

2-10 of the Juvenile Court Act (705 ILCS 405/2-10 (West 2018)), finding probable cause that Iris was neglected due to medical child abuse perpetrated by her mother. The court found there was an urgent and immediate need to remove Iris from her mother's care. However, the court found no cause to remove Iris from her father's care.

¶ 12    The trial court returned Iris to the legal custody of Christopher under an order of protection pursuant to section 2-25 of the Juvenile Court Act (705 ILCS 405/2-25 (West 2018)). In doing so, the court left intact a prior order from the domestic relations court requiring that Christopher's contacts with Iris be professionally supervised. This resulted in an arrangement whereby Christopher exercised legal custody over Iris, but she resided in the home of a cousin. The court also ordered that Rebecca's visitation be limited to supervised day visits, consistent with the orders entered in the domestic relations proceedings. In addition, the court entered an order appointing a guardian *ad litem* to represent Iris.

¶ 13    On November 20, 2019, the trial court, on motion of the guardian *ad litem*, entered an order modifying Christopher's visitation rights. Under the modification, Christopher's visits could now be supervised by another adult, rather than by a professional monitor. Christopher's visitation rights were further modified in that his visits were no longer required to take place in a public location and the eight-hours per week limitation was vacated.

¶ 14                              A. Adjudication Hearing

¶ 15    Due to delays resulting from the COVID-19 pandemic, hearings on the State's petition for adjudication of wardship did not commence until December 2, 2020. The trial court conducted Zoom hearings on the petition over a five-day period. The State called five witnesses, starting with DCP investigator Morrison.

¶ 16    Morrison testified she was assigned to investigate a hotline call made to DCFS on May 2,

5

2019, reporting that a six-year-old minor had made an outcry that her father sexually abused her during a visit. According to the report, the father, who at the time was accompanied by a visitation monitor, put his hand inside his minor daughter's pant and stuck his finger in her anus. The report stated that the mother called the police and then took the minor to the hospital after she found blood on toilet tissue used to wipe the minor following a bowel movement.

¶ 17    At the time Morrison was assigned the case, six prior hotline calls regarding Iris had been made to DCFS over a four-year period. These hotline calls triggered investigations and medical examinations which ultimately found no evidence of child sexual abuse but resulted in Iris undergoing victim-sensitive interviews (VSIs) on September 7, 2016; March 9, 2017; and June 8, 2018.

¶ 18    As a result of the hotline call made May 2, 2019, Iris underwent her fourth VSI on May 8, 2019. At the time of the interview, Iris was six years old. Morrison personally observed the interview. Iris made no outcries of sexual abuse during the interview.

¶ 19    During her investigation, Morrison reviewed documents in the minor's case file and other materials generated from prior investigations. Morrison also interviewed various individuals as part of her investigation. Her investigation revealed the following evidence.

¶ 20    On August 5, 2016, when Iris was 4 years old, Rebecca had her watch a DVD on potty training. According to Rebecca, Iris stated that the DVD "smelled like penis." Rebecca asked Iris how she knew what a penis smelled like, and Iris reportedly responded, "from Daddy." Upon further questioning, Iris reportedly told her mother that her father had touched her vagina with his penis. Christopher denied ever touching Iris in such a manner.

¶ 21    On August 31, 2016, Christopher made a hotline call to DCFS due to his concerns about being falsely accused of sexually abusing his daughter. On the same day, Rebecca also made a

6

hotline call to DCFS. As a result of these hotline calls, DCP investigators conducted the first of nine separate interviews of Iris. The investigation included Iris's first VSI, which took place on September 7, 2016. Iris made no disclosures during this interview. DCFS found no credible evidence that Christopher abused Iris and the initial report was deemed unfounded. The police consequently suspended their contemporaneous investigation of the case.

¶ 22    Rebecca continued to question Iris about sexual abuse. Rebecca sent text messages to DCP investigator Brigitte Broadway, asking that DFCS reinterview Iris. Rebecca told the investigator that she asked Iris why she did not disclose the sexual abuse, and Iris responded that she was "shy." Investigator Broadway reinterviewed Iris in October 2016. During this interview, Iris stated that her father touched her vagina when they were bathing together and that he told her not to tell her mother.

¶ 23    In November 2016, Iris began therapy. Iris told the therapist that her father touched her with his penis. In December 2016, two separate hotline calls were made to DCFS alleging that Christopher had sexually abused Iris. Around this same time, Christopher voluntarily agreed to a preliminary order in the divorce action requiring that his contacts with Iris be professionally supervised.

¶ 24    DCP investigator Misha Wofford interviewed Iris on January 4, 2017. During the interview, Iris stated that she did not want to be interviewed without her mother. The investigator then interviewed Iris in the presence of her mother. Iris reported that the sexual abuse occurred "11 times." When the investigator asked Iris if she was afraid of her father, Iris looked at her mother and said, "yes right mommy." An investigation determined that the allegations were unfounded.

¶ 25    On February 7, 2017, during a therapy session, Iris told the therapist that her father sexually

7

abused her in a bathtub when they were on a trip to California. This disclosure led to another hotline call and additional interventions. On February 14, 2017, Iris was examined by Dr. Emily Sifferman at the Child Advocacy Center (CAC) in Chicago. The doctor questioned Iris and conducted the first of at least eight separate medical examinations of the minor, most involving genital examinations. Iris described how her father touched her with his penis while they were in the bathtub. The medical examination yielded no evidence of abuse.

¶ 26    In February 2017, Francie Sheehan was appointed by the domestic relations court to supervise the visits between Christopher and Iris. Sheehan was aware of the allegations of sexual abuse. During one visit, Sheehan and Christopher were sitting at a kitchen table with Iris doing arts and crafts, when Iris noticed a picture postcard of the Washington Monument on the refrigerator. Iris stated that it looked like a penis. Sheehan was alarmed by Iris's statement.

¶ 27    On another occasion, upon picking Iris up for a visit with Christopher, Rebecca told Sheehan that Iris had a secret to tell her. During the visit, Iris was using the bathroom when she called Sheehan into the bathroom to tell her a secret. Iris told Sheehan that her mom told her to tell Sheehan that her dad put his penis on her vagina. When Sheehan and Iris returned from the visit, Rebecca asked Sheehan if Iris told her about the secret. Sheehan responded "no" because she did not feel it was her part to say anything to Rebecca. Sheehan believed that Rebecca had coached Iris to make the statement.

¶ 28    Iris underwent her second VSI on March 9, 2017. During this VSI, Iris reported that her father put his penis inside her vagina while they were in the bathtub together and that he shot something in her face that "smelled yucky," and that her mother caught them. On the same date, the domestic relations court appointed Dr. Mary Gardner, a licensed clinical psychologist, to conduct a child-custody evaluation of the family pursuant to section 604.10(b) of the Illinois

8

Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/604.10(b) (West 2018)). On March 22, 2017, Christopher voluntarily took and passed a polygraph examination regarding the allegations of sexual abuse.

¶ 29  In January 2018, when Iris was five years old, one of her teachers informed Kristin Hale, administrator of the school, that Iris had told her "something very disturbing." Hale met with Iris and her teacher. Iris stated that "her daddy stuck his penis in her vagina and that she was only allowed to tell adults." Hale testified that Iris's demeanor and her use of the words "penis" and "vagina," along with the matter-of-fact manner in which she gave her statement, led Hale and the teacher to believe that someone coached Iris to make the statement. Hale made a hotline call to DCFS.

¶ 30  The next allegation of sexual abuse against Christopher arose from a supervised visit on the weekend of May 25-27, 2018. It was Iris's birthday weekend. Iris stayed at Christopher's home, which was a three-bedroom ranch-style house. Also at the home were Christopher's grandmother and Gabby Dillman. Christopher hired Dillman as a live-in nanny to provide court-ordered supervision on the weekends he had visitation with Iris. Dillman slept in a guest bedroom and Iris had her own bedroom, which was five or six feet away from where Dillman slept. Dillman slept with her bedroom door open just in case Iris got up for something in the middle of the night. Christopher slept on the couch while his grandmother was visiting.

¶ 31  When Iris returned home that Sunday after the weekend visit, she used the toilet and had a bowel movement. Rebecca wiped Iris's bottom and discovered blood on the toilet tissue, which she attributed to Iris being sexually abused by Christopher. Rebecca called the police, who instructed her to take Iris to the hospital. The next day, May 28, 2018, Rebecca took Iris to the emergency room at Palos Hospital. Iris was questioned by a nurse and was then transferred to Rush

9

Hospital where she was examined, including a genital examination. There was no evidence of sexual abuse.

¶ 32 This incident led to another hotline call and DCFS investigation. It also led to Iris undergoing her third VSI on June 8, 2018. During this interview, Iris reported that her father "put his penis in her vagina and rectum at nighttime" while she pretended to be asleep, and that it happened "lots of times." On June 12, 2018, Rebecca followed a recommendation to take Iris to Edward Elmhurst Hospital where she underwent additional genital examinations.

¶ 33 Dillman subsequently wrote to DCFS about Iris's birthday weekend. Dillman stated that she was present the entire time Iris visited with Christopher that weekend and that there was no possibility Christopher could have sexually abused Iris under her watch. Dillman stated that she believed Iris was being told what to say.

¶ 34 In conjunction with the ongoing divorce action, Rebecca retained the services of Dr. Alan M. Jaffe, a clinical psychologist, to conduct a psychological examination of Christopher pursuant to Illinois Supreme Court Rule 215(a) (eff. March 28, 2011). Rule 215(a) provides in relevant part that "In any action in which the physical or mental condition of a party *** is in controversy, the court, upon notice and on motion made within a reasonable time before the trial, may order such party to submit to a physical or mental examination by a licensed professional ***." As part of his evaluation, Dr. Jaffe conducted an interview of Iris on June 12, 2018. During the interview, Iris repeated her previous allegations of sexual abuse, which the doctor determined were credible.

¶ 35 Sheehan supervised Christopher's visitation with Iris on February 16, 2019. Sheehan testified that she was in eyesight and earshot of Christopher and Iris during the entire visitation and nothing untoward occurred. When Iris returned home after the visit, she used the toilet and had a bowel movement. Rebecca again discovered blood on the toilet tissue. Rebecca took Iris to

10

Advocate Christ Medical Center where medical personnel noted her history of constipation and the fact that Iris herself made no claim of abuse. No male DNA was detected on the blood samples collected from the toilet tissue.

¶ 36    Sheehan also supervised the visit between Christopher and Iris on May 2, 2019, during which Christopher was again accused of sexually abusing Iris. Sheehan testified that on that date, she and Christopher picked up Iris and they all traveled to a shopping mall. It was raining when they arrived at the mall, so they decided to run through the parking lot. Sheehan held onto Christopher's right arm while he carried Iris on his shoulders, holding her ankles. Sheehan, who is a mandated reporter, testified that she never observed Christopher put his hands inside Iris's pant or put his finger inside her vagina or anus.

¶ 37    Investigator Morrison spoke in person with Rebecca on May 8, 2019. Rebecca expressed concern that Christopher was sexually abusing Iris. Morrison told Rebecca about the need for a possible safety plan and forensic interview for Iris. Morrison screened Rebecca for substance abuse, domestic violence, and mental health. Rebecca disclosed that she suffered from anxiety and depression, for which she was seeing a mental health provider and taking prescribed medication. Rebecca also indicated she was a victim of sexual abuse by a family member. Morrison created a safety plan for Iris based on "risk factors of the case," and to "gather more information." Under the safety plan, Rebecca agreed that Iris would stay at the home of Heidi J., one of Rebecca's friends. Morrison also spoke in person with Christopher. Morrison screened him for substance abuse and domestic violence.

¶ 38    Morrison reevaluated the safety plan and terminated it on May 23, 2019. Morrison testified that during her last reevaluation of the safety plan, which was conducted in the presence of the parents and Iris, she observed Rebecca attempting to coach Iris. Rebecca told Iris to tell Morrison

that she wanted to be in her "own bed." Iris responded that she was "okay at Miss Heidi's house." Morrison decided to terminate the safety plan and return Iris to Rebecca's custody after Rebecca agreed to engage in intact family services, follow up services for Iris, and agreed that a nanny would be present in the home, except during nighttime hours when Iris was asleep. Christopher believed the safety plan should remain in effect.

¶ 39    Morrison consulted with Dr. Glick concerning her suspicions that Iris might be the victim of medical child abuse, instigated by Rebecca. She requested the doctor review Iris's case and render an MPEEC opinion. Morrison provided the doctor with her investigatory notes and the notes from prior investigations.

¶ 40    Dr. Glick was qualified as an expert in the fields of pediatric emergency medicine, pediatrics, and child abuse pediatrics. On direct examination, Dr. Glick acknowledged that over a four-year period, Iris visited at least five different hospitals for sexual abuse examinations and underwent four different forensic interviews, which the doctor determined was emotionally harmful to Iris. The doctor opined that Iris was a victim of medical child abuse resulting from "unnecessary and excessive evaluations," and she identified Rebecca as the primary instigator of that abuse. Dr. Glick went on to say that Rebecca caused Iris to be subjected to multiple and unnecessary forensic interviews and medical examinations as a result of her unfounded allegations of child sexual abuse against Christopher.

¶ 41    Dr. Glick explained that in rendering her opinion, she not only relied on the materials she received from Morrison, but also on the fact that Iris's descriptions of sexual abuse became more numerous, embellished, and detailed with each successive interview. The doctor noted that at the time the sexual abuse allegedly occurred, Iris and her father were under the supervision of monitors, who all claimed there was no way such abuse could have occurred on their watch. This

12

raised concerns that Rebecca had coached Iris to make false accusations of sexual abuse.

¶ 42    Dr. Glick testified that based on her review of the case, there was no credible evidence that Christopher sexually abused Iris. The doctor based her opinion in part on the fact that one of the initial hotline calls was made by Christopher himself, who feared he would be falsely accused of sexually abusing Iris. Dr. Glick testified that she had "almost never seen a parent self-report." The doctor noted that Christopher willingly took and passed a polygraph examination. Christopher also agreed that his contacts and visits with Iris should be supervised, and he followed the recommendations of the court.

¶ 43    On cross-examination by counsel for Rebecca, Dr. Glick acknowledged that Dr. Jaffe found Iris to be credible but added that in light of the context in which the allegations of sexual abuse were made, Dr. Jaffe failed to consider the possibility that Iris was being coached by her mother. The doctor also acknowledged that although she found that Iris was a victim of medical abuse, she could not give an opinion as to whether Iris was "emotionally impaired."

¶ 44    The trial court asked Dr. Glick, "[d]o you need to have impairment for there to be a finding of medical child abuse?" Dr. Glick answered "[n]o." The court then asked the doctor whether Iris's descriptions of sexual abuse became increasingly embellished and detailed because she became more comfortable with the interviewers and "opened up?" Dr. Glick acknowledged it was an interesting question but stated that she did not believe that was the case because each successive statement Iris gave contained new allegations of abuse.

¶ 45    Dr. Gardner was called as a witness by the guardian *ad litem* and was qualified as an expert in the fields of clinical psychology, forensic child custody evaluations, and forensic interviewing of children and parents. Dr. Gardner conducted a child-custody evaluation of the family in conjunction with the divorce action, pursuant to section 604.10(b) of the Marriage Act (750 ILCS

13

5/604.10(b) (West 2018)). As part of her evaluation, which took approximately five months to complete, Dr. Gardner reviewed various documents and court filings; met with Iris and her parents individually; observed each parent with Iris; and then held a final meeting with both parents to discuss her findings and get their input. Following her evaluation, Dr. Gardner prepared a report dated September 3, 2017, which was admitted into evidence.

¶ 46    In her report, Dr. Gardner noted that "[o]ne of the most relevant factors in this case is that the sexual abuse allegations occurred in the midst of a high conflict divorce. Divorces can be a time of great stress, and there is much at stake." The doctor further noted that "[t]he effects of repeated interviewing and children's suggestibility must be considered in this case." Dr. Gardner explained "suggestibility" as follows:

> "[U]nderlying memories of an event can in fact be altered if the conditions are right and if the individual receives repeated statements, actions, events that are contrary to the underlying memory. *** Under certain circumstances false memories can be implanted, and children may believe something that is in actuality not true."

¶ 47    Dr. Gardner stated that very young children around the ages of three or four are the most susceptible to suggestion. The doctor testified that at the time she began her evaluation of the family, Iris was four years old. Dr. Gardner explained that when a young child makes an allegation of sexual abuse, it is crucial that there be no extensive discussion of the matter before the forensic interview is conducted. This procedure is to avoid the child being subjected to suggestibility prior to the interview.

¶ 48    In this case, Dr. Gardner noted that Iris was subjected to repeated questioning by her mother. The doctor opined that it appeared that Rebecca "had begun to process her own experience with sexual abuse" and was "transferring some of her own issues on to Iris." The doctor pointed

14

out that Iris's maternal grandmother and uncle also engaged in conversations with Iris where they expressed their belief that Iris had been sexually abused by her father. The doctor opined that these discussions were "part of the family dialogue, part of the family narrative in Iris' life," and impacted the accuracy and reliability of her disclosures.

¶ 49    Dr. Gardner also testified about the dangers of subjecting young children to repeated forensic interviews. The doctor explained that when a child is repeatedly interviewed or questioned about the same subject matter, this can impact the reliability of the child's disclosures because the child may begin to assume that they gave the wrong answers in the initial interviews. Dr. Gardner testified that by the time she began her evaluation of the family in April 2017, Iris had already been subjected to two VSIs, as well as multiple interviews by the police and DCP investigators.

¶ 50    Dr. Gardner also explained how the use of leading and "forced" questions when interviewing a child can impact the reliability of the child's disclosures of sexual abuse. The doctor differentiated between the two types of questions and explained that forced-answered questions set up situations where a child has limited or no real ability to accurately answer the question, such as "how much did it hurt?" The child is limited to answering a little or a lot.

¶ 51    Dr. Gardner testified that using leading or forced questions when interviewing a child can "contaminate" the interview by encouraging the child to offer answers the child believes will please the interviewer, regardless of whether the answer is true. The doctor testified that such questions can elicit inaccurate information, and if the information is repeated, it can create a false memory, causing the child to implant and believe something they did not believe prior to the interview. Dr. Gardner opined that Dr. Jaffe used leading and forced questioning when he interviewed Iris, which was improper.

¶ 52    Dr. Gardner explained that once a child's memory is altered or encoded by successive

15

forensic interviews or by leading and forced questions, it is difficult to undo the harm through later proper interviews. The doctor opined that the fact that Iris's descriptions of sexual abuse became increasingly embellished and detailed with each successive forensic interview, was evidence that her memory was being altered. The doctor stated that in addition to the impact these forensic practices may have on the reliability of a child's disclosures, these practices can cause trauma to a child who falsely believes they were sexually abused. The doctor opined that it was emotionally harmful to Iris to subject her to repeated interviews and medical examinations.

¶ 53 Dr. Gardner added that her evaluation of the family also took into consideration their liberal approach to sexual matters. The doctor noted that the parents were "fairly sexually liberated" and exposed Iris to sexual images and language such as penis and vagina. The parents admitted they were sometimes naked around Iris. Rebecca also showed Iris "Alex Grey" cards depicting human anatomy with full frontal nudity, as an education tool. Dr. Gardner opined that all this was significant because it showed that Iris "had been acculturated" and "familiarized that it is perfectly fine to talk about penises and vaginas." The doctor testified that "Iris was accustomed to freely making statements like that monument looks like a penis."

¶ 54 Dr. Gardner did not find that the parents' behavior in this regard was abusive to Iris. Rather, the doctor opined that the behavior was unhelpful and confusing to a child of Iris's age. The doctor agreed that Iris's exposure to sexual images and language was relevant to understanding her disclosures, given the fact that her family "talks about penises and vaginas and has a free willing [*sic*] way of dealing with sexual matters."

¶ 55 Dr. Gardner testified that during the course of her evaluation of the family, she did not learn or observe anything to support Rebecca's allegations that Iris was sexually abused or otherwise harmed or endangered by her father.

16

¶ 56    On cross-examination by counsel for Rebecca, Dr. Gardner acknowledged that she did not believe Rebecca intentionally tried to harm Iris. The doctor also acknowledged that when she used the word "family" in regard to Iris being exposed to sexualized matters, she was including not only Rebecca, but also Christopher, along with the maternal grandmother and uncle. Dr. Gardner further acknowledged that during her evaluation, she never heard Iris or anyone else say that Rebecca instructed Iris to make up the allegations of abuse.

¶ 57    On cross-examination by counsel for Christopher, Dr. Gardner agreed that although Rebecca did not intentionally try to harm Iris, her conduct nevertheless emotionally damaged Iris. The doctor determined that Rebecca's conduct also damaged the relationship Iris has with her father.

¶ 58    The trial court asked Dr. Gardner, "[w]hat was the affect [*sic*] of mom's allegations on Iris?" The doctor responded that the allegations were for adults and not children. Dr. Gardner testified that Rebecca's conduct put Iris in a "situation of stress and distress." The doctor opined that it was stressful on Iris "to have those who she loves so much believe that there is something wrong with her father and that he has done terrible things to her." The doctor added that this would not only be damaging to a child if the allegations of abuse were true, but certainly if they were not true.

¶ 59    The trial court asked Dr. Gardner if she had an opinion as to what made Rebecca conclude that Iris was sexually abused. The doctor opined that a combination of factors might have led Rebecca to come to that conclusion including her own experience with sexual abuse from a family member, the family's liberal approach to sexual matters, and the fact that the couple was going through a contentious and ongoing divorce action involving custody of a minor female child. Dr. Gardner testified that her evaluation did not disclose any basis to support Rebecca's conclusion

17

that Iris was sexually abused.

¶ 60    Rebecca was called as a witness by her counsel. Rebecca denied coaching Iris to make any allegations of sexual abuse. She also denied that the ongoing divorce action motivated her to make allegations of sexual abuse against Christopher.

¶ 61    Rebecca testified that Iris made over four outcries. The first was in August 2016, when Iris said that a DVD smelled like a penis. The second outcry occurred approximately a week later when Rebecca questioned Iris as to when she smelled a penis. Iris responded that she smelled her father's penis in the bathroom when Rebecca was in California. The third outcry occurred in December 2016, when Iris was in the bathtub washing her "private region" and told her mother, "my daddy did this."

¶ 62    Rebecca testified that Iris made her fourth outcry to a nurse at Palos Hospital on May 2018, after blood was discovered on toilet tissue Iris used to wipe herself after a bowel movement. Rebecca testified that Iris made another outcry in February 2019, after blood was again discovered on toilet tissue Iris used following a bowel movement.

¶ 63    On cross-examination by counsel for Christopher, Rebecca acknowledged that no male DNA was detected on a rape kit performed in May 2018 or on blood samples collected from the pieces of toilet tissue. She also acknowledged that Christopher was never criminally charged with sexually abusing Iris but suggested that this was because he suborned perjured testimony from the nanny. Rebecca further acknowledged that the allegations of sexual abuse made against Christopher were determined to be unfounded.

¶ 64    Rebecca also admitted that she told Dr. Jaffe and the police that Iris made the following additional allegations of sexual abuse: Christopher recruited his friends and neighbors to sexually assault Iris; Christopher filmed other men sexually assaulting Iris and the film was on the Internet;

18

Christopher offered men $16 to sexually assault Iris while she was asleep; Christopher showed videos of other fathers sexually abusing their daughters; and Christopher forced Iris to drink his urine.

¶ 65 On cross-examination by the State, Rebecca acknowledged that when she was 28 years old, she was sexually abused by a family member. Rebecca admitted that she never actually saw Christopher perform any sexual act on Iris. Rebecca also admitted that both she and Christopher would sometimes take baths with Iris, until she was four years old.

¶ 66 At the conclusion of Rebecca's testimony, the parties rested and subsequently presented their closing arguments. After hearing argument from counsels, the trial court found that Iris was abused and neglected based on lack of care and injurious environment. The court's findings were based on its determination that the State had proven, by a preponderance of the evidence, that Iris was a victim of medical child abuse instigated by her mother. The matter was continued for the dispositional hearing.

¶ 67                                  B. Dispositional Hearing

¶ 68 The dispositional hearing was conducted on April 1, 2021. The hearing addressed issues of intact services provided to the parents and Iris, as well as visitation. Intact services are provided to families while the children remain in the home. The following evidence was presented at the hearing.

¶ 69 Iris was eight years old. She was living with her father and attending school, where she maintained good grades and earned achievement awards. Daycare was not an issue as Christopher was working from home.

¶ 70 Ariana Cerecedes, an intact caseworker employed by Children's Home & Aid, testified that she inherited Iris's case from her previous caseworker in October 2020. Cerecedes testified

that since that time, she has visited the father's home every other week. During her visits, Cerecedes frequently sees Christopher's mother, grandmother, cousin, or nanny, as well as Iris's friends. Cerecedes found the home to be safe and appropriate. There were no signs of abuse or neglect, and no incidents had occurred since Iris was placed in her father's care. Cerecedes testified that Iris was happy and outgoing and had made friends with some little girls across the street.

¶ 71    Rebecca was engaged in therapy for stress management. She had been diagnosed with an anxiety disorder, for which she was prescribed medication. The integrated assessment recommended that when it was clinically appropriate, Rebecca and Iris should engage in family therapy and Rebecca should take part in co-parenting services. Rebecca currently had supervised visits with Iris for 7 hours every Sunday.

¶ 72    According to Cerecedes, Rebecca continued to believe that Christopher sexually abused Iris and had failed to recognize that her conduct may have harmed her daughter. The State and guardian *ad litem* expressed concern that, so far, Rebecca's therapy had not addressed the reasons the case came into the court system. They expressed concern that Rebecca's therapists and visitation supervisor had not been provided with Dr. Glick's MPEEC opinion or Dr. Gardner's 604.10(b) evaluation.

¶ 73    Christopher was engaged in therapy for stress management. The integrated assessment recommended that Christopher take part in family therapy and co-parenting services, when it was clinically appropriate. Iris was also engaged in therapy. During her therapy sessions, Iris had not made any outcries of sexual abuse. In addition, the therapist expressed no concerns about Iris living with her father.

¶ 74    Cerecedes recommended that Iris's case be closed. In support of her recommendation, Cerecedes explained that at the time her agency received the case, the family was already receiving

20

intact services through a private provider. Cerecedes reiterated that she found the father's home to be safe and appropriate. Cerecedes opined that it would be harder to manipulate Iris into saying something, given that she was older and that the visits with her mother were being supervised.

¶ 75     The State and guardian *ad litem* disagreed with the recommendation to close the case. They argued that the case should not be closed until Rebecca receives therapy to address the reasons the case originally came into the court system.

¶ 76     The trial court rejected the recommendation to close Iris's case. The trial court stated in part:

> "[T]he issue of case origin and mother's involvement in this case has not been addressed in therapy. I find an omission that the integrated assessment has not been provided to the therapist for the mother and I believe there would be additional benefit if the [mother's therapist] were to have the opinions of both Dr. Glick and Dr. Gardner in continuing on in therapy for mother and addressing the issue of case origin. Until it is addressed I believe there is a serious concern of repeat behavior by mother who I don't know if the next outcry would be by the end of the day or before the end of the day. I believe that threat that it would continue exists until it is, in fact, addressed in therapy."

¶ 77     The trial court adjudicated Iris a ward of the court. The court found Rebecca unable for some reason other than financial circumstances alone to care for, protect, train, or discipline Iris. The court found Christopher fit, able, and willing to care for, protect, train, and discipline Iris. The court ordered that Iris remain in the care and custody of Christopher under an order of protective supervision pursuant to section 2-24 of the Juvenile Court Act (705 ILCS 405/2-24 (West 2018)). The order was conditioned, in part, upon Christopher ensuring that Rebecca's visits with Iris be professionally supervised. This appeal by Rebecca followed.

21

¶ 78                                        II. ANALYSIS

¶ 79    Rebecca did not argue or brief the trial court's dispositional rulings. We also note that Christopher has not appealed from either the adjudicatory or dispositional orders. However, like the guardian *ad litem*, Christopher has filed a brief in support of the court's orders.

¶ 80    "We begin by noting that the best interests of the child is the paramount consideration whenever a petition for adjudication of wardship or any proceeding is brought under the Juvenile Court Act." *In re K.G.*, 288 Ill. App. 3d 728, 734-35 (1997). The Juvenile Court Act sets forth a step-by-step process courts use to decide whether a minor child should be removed from their parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship is filed by the State and the minor is placed in temporary custody, the trial court must make a finding that the child is abused, neglected, or dependent before it conducts an adjudication of wardship. 705 ILCS 405/2-21 (West 2018); *Id*. In making that finding, the rules of evidence in the nature of civil proceedings apply. *In re A.W.*, 231 Ill. 2d 241, 256 (2008). If the court finds that the minor is abused, neglected, or dependent, it then conducts a dispositional hearing to determine whether the minor should be made a ward of the court. *In re Faith B.*, 216 Ill. 2d 1, 14 (2005); *In re Jay H.*, 395 Ill. App. 3d 1063, 1068 (2009).

¶ 81    Cases involving allegations of abuse and neglect are distinctive and must be decided based upon their unique facts. *In re Arthur H.*, 212 Ill. 2d at 463. The State has the burden of proving allegations of abuse, neglect, or dependency by a preponderance of the evidence. *In re Faith B.*, 216 Ill. 2d at 13. A preponderance of the evidence is "that amount of evidence that leads a trier of fact to find that the fact at issue is more probable than not." *In re K.G.*, 288 Ill. App. 3d at 735.

¶ 82    A neglected minor includes any minor under 18 years of age who is not receiving "care necessary for his or her well-being" or "whose environment is injurious to his or her welfare." 705

ILCS 405/2-3(1)(a), (b) (West 2020). "[N]eglect is defined as the failure to exercise the care that circumstances justly demand and embraces both willful and unintentional disregard of parental duty." (Internal citations and quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d at 463. The phrase "injurious environment has been recognized as an amorphous concept that cannot be defined with particularity, but is generally interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal citations and quotation marks omitted.) *Id.*

¶ 83    On review, a trial court's finding of abuse, neglect, or dependency will not be reversed unless it is against the manifest weight of the evidence. *Id.* at 464; *In re Faith B.*, 216 Ill. 2d at 13-14. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*; *In re Arthur H.*, 212 Ill. 2d at 464.

¶ 84                                                A. Adjudicatory Order

¶ 85    Rebecca raises a number of arguments in support her contention that the trial court's adjudicatory findings of abuse and neglect were against the manifest weight of the evidence. We address each in turn.

¶ 86    Rebecca contends the trial court erred in finding that she coached Iris into making false allegations of sexual abuse against her father. We disagree. There is ample evidence in the record showing that Rebecca coached Iris.

¶ 87    On January 4, 2017, DCP investigator Wofford interviewed Iris in the presence of Rebecca. When the investigator asked Iris if she was afraid of her father, Iris looked at her mother and said, "yes right mommy."

¶ 88    On another occasion, during a visit to Christopher's home, Iris was using the bathroom when she called Sheehan into bathroom to tell her a secret. Iris told Sheehan that her mom told her

to tell Sheehan that her dad put his penis on her vagina. When Sheehan and Iris returned from the visit, Rebecca asked Sheehan if Iris had told her about the secret.

¶ 89     In January 2018, one of Iris's teachers informed school administrator Kristin Hale that Iris had told her "something very disturbing." Hale met with Iris and her teacher. Iris stated that "her daddy stuck his penis in her vagina and that she was only allowed to tell adults." Hale testified that Iris's demeanor and her use of the words "penis" and "vagina," along with the matter-of-fact manner in which she gave her statement, led Hale and the teacher to believe that someone coached Iris to make the statement.

¶ 90     In May 2019, DCP investigator Morrison was reevaluating a safety plan when Rebecca told Iris to tell Morrison that she wanted to be in her "own bed." Iris responded that she was "okay at Miss Heidi's house."

¶ 91     The above evidence is consistent with Dr. Glick's opinion that there was compelling evidence that Rebecca was coaching Iris to make false allegations of sexual abuse against her father. Dr. Glick also noted that Carli Lobraco, the therapist who was seeing Iris in 2019, raised concerns that Rebecca was coaching Iris. Rebecca suggests that if Iris was coached, she was coached by her father. There is nothing in the record to support this speculation.

¶ 92     Rebecca contends that the trial court erred in relying on the opinions of Dr. Glick and Dr. Gardner, arguing that their opinions were not objective or credible. Rebecca takes issue with Dr. Glick's opinions on the grounds that the doctor did not personally interview or speak with the individuals who produced the material she relied upon in reaching her opinions. We find this argument unpersuasive.

¶ 93     The record shows that Dr. Glick rendered her MPEEC opinion after reviewing voluminous and comprehensive records provided to her from DCP investigator Morrison. Moreover, on

24

redirect examination by the State, Dr. Glick explained that there was no need to personally interview the individuals who collected the data and produced the materials she relied upon in reaching her opinion because interviewing them would not have assisted her in reaching her own independent opinion. Dr. Glick testified "[t]here was really no need for me to be interviewing, except to talk to the DCFS investigator to answer her question about the – the worry about the medical child abuse."

¶ 94    Rebecca takes issue with Dr. Gardner's opinions on the grounds that the doctor's evaluation was completed on September 3, 2017, and therefore suggests that the evaluation failed to consider data and evidence occurring after the report was completed. Rebecca argues that this detracts from the validity of the doctor's opinions. We disagree. On direct examination by the guardian *ad litem*, Dr. Gardner testified that she reviewed additional documents supplied to her that were not available to her at the time she completed her evaluation. These documents obviously did not change her opinion. We also note the trial court heard from some of the witnesses who provided information that Dr. Gardner and Dr. Glick relied upon in reaching their respective opinions.

¶ 95    We further note that Rebecca did not present her own expert witness to rebut the expert testimony of Dr. Glick and Dr. Gardner. Rebecca relies on Dr. Jaffe's report in an attempt to diminish and undermine the doctors' testimony, but Dr. Jaffe did not testify in this case. "The circuit court cannot disregard expert medical testimony that is not countervailed by other competent medical testimony or medical evidence." *In re Ashley K.*, 212 Ill. App. 3d 849, 890 (1991). In addition, both doctors were critical of Dr. Jaffe for using leading and forced questioning when he interviewed Iris and the trial court noted this criticism.

¶ 96    Rebecca next argues that the evidence failed to rule out the possibility that Christopher

25

sexually abused Iris. This argument is meritless because it ignores the issue the trial court was required to determine. The court was charged with determining whether the State satisfied its burden of proving that Iris was a victim of medical child abuse by a preponderance of the evidence, not whether there was sufficient evidence in the record to rule out the possibility that Christopher sexually abused Iris. "The purpose of juvenile court proceedings is to determine the *status* of the child on whose behalf the proceedings are brought, *not* to determine any particular person's criminal or civil liability." (Emphasis in original.) *In re R.B.*, 336 Ill. App. 3d 606, 614 (2003).

¶ 97    Rebecca next contends that the trial court's adjudicatory findings were against the manifest weight of the evidence, arguing that she was not the person who told the forensic interviewers that Iris was a victim of sexual abuse; rather, it was Iris who made these allegations, outside her presence. Rebecca argues that Iris was the genesis of the reports of sexual abuse. Rebecca also argues that no one testified that they heard her tell Iris to make up allegations of abuse against her father. These arguments are unpersuasive because they fail to account for the fact that although Iris made outcries of sexual abuse, the evidence and expert testimony established that Rebecca coached Iris to make these outcries and the minor was in the unsupervised custody of Rebecca up until the forensic interviews started.

¶ 98    Rebecca next contends that Iris's outcries of sexual abuse gave her a good-faith belief that Christopher sexually abused Iris. We disagree.

¶ 99    Investigator Morrison testified that when she was assigned Iris's case on May 2, 2019, there had been six prior DCFS investigations based on allegations that Christopher sexually abused Iris and each investigation was reported to be unfounded. A report is unfounded when "it is determined after an investigation that no credible evidence of abuse or neglect exists." 325 ILCS 5/3 (West 2012). Even though the successive reports of sexual abuse against Christopher were all

26

unfounded, they caused Iris to undergo medical examinations at CAC in February 2017; Palos Hospital and Rush Hospital in May 2018; Elmhurst Hospital in June 2018; and Christ Hospital in February 2019 and again in May 2019. Iris also underwent VSIs on September 7, 2016; March 9, 2017; and June 8, 2018.

¶ 100   With each successive unfounded DCFS report, medical examination yielding no evidence of abuse, no male DNA detected on blood samples collected from the toilet tissue, and Christopher voluntarily taking and passing a polygraph examination, there was less objective reason for anyone to believe that Christopher sexually abused his daughter. This is especially so when we consider the more outlandish allegations Rebecca claimed Iris made against her father such as: he recruited his friends and neighbors to sexually assault Iris; he filmed other men sexually assaulting Iris; he offered other men $16 to sexually assault Iris while she slept; he showed videos of other fathers sexually abusing their daughters; and he forced Iris to drink his urine.

¶ 101   The evidence shows that Iris was exposed to multiple and unnecessary medical examinations and forensic interviews which amounted to medical child abuse and that Rebecca was the instigator of that abuse. The trial court was charged with determining whether the multiple medical examinations and forensic interviews imposed on Iris as a result of Rebecca's conduct amounted to medical child abuse. The sincerity of Rebecca's good-faith belief that Christopher abused Iris was irrelevant in regard to the court's determination, insofar as neglect encompasses both willful and unintentional disregard of parental duty. *In re Stephen K.*, 373 Ill. App. 3d 7, 20 (2007).

¶ 102   Finally, Rebecca attacks the credibility of Morrison and Hale, who provided testimony of coaching. Rebecca also attacks the credibility of Sheehan and Dillman, who testified that it was impossible for Iris to have been sexually abused during the visits they respectively supervised.

27

Here, the trial court observed the witnesses as they testified and is therefore in a better position than this court to assess their credibility. *Serritella v. Plotkin*, 89 Ill. App. 3d 739, 740 (1980). Unless the trial court's decision is against the manifest weight of the evidence, which means that the opposite conclusion is clearly evident, a reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *In re D.F.*, 201 Ill. 2d 476, 499 (2002). In this case, the opposite conclusion is not clearly evident and therefore this court will not substitute its judgment for that of the trial court.

¶ 103    Based on the foregoing, we conclude that the trial court's findings of abuse and neglect with respect to Iris were not against the manifest weight of the evidence. For these reasons, we affirm the court's adjudicatory order.

¶ 104                                B. Dispositional Order

¶ 105    We note that although Rebecca did not argue or brief the trial court's dispositional findings, her notice of appeal indicates she seeks review of findings after the adjudication and dispositional hearings. Therefore, we will address the court's dispositional findings.

¶ 106    Under section 2-7(1) of the Juvenile Court Act, a trial court may commit a minor to DCFS wardship if the court finds that the parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2018); *In re Ta. A.*, 384 Ill. App. 3d 303, 306-07 (2008). We review a trial court's dispositional decision under a manifest weight of the evidence standard. *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the court

28

selected an inappropriate disposition. *Id.* at 1060; *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 44.

¶ 107   We find the trial court's findings were supported by the evidence and that the dispositional order selected by the court was appropriate. At the dispositional hearing, the trial court heard evidence that Rebecca continued to believe that Christopher sexually abused Iris and had failed to recognize that her conduct may have harmed her daughter. Further, Rebecca's therapists had not been provided with Dr. Glick's MPEEC opinion or Dr. Gardner's 604.10(b) evaluation.

¶ 108   The trial court opined that Rebecca would benefit if her therapist were provided with the opinion and evaluation. The court expressed concern that until Rebecca received the proper therapy and addressed the reasons the case came into the court system, she could continue to claim that Iris made new outcries of sexual abuse.

¶ 109   The trial court adjudicated Iris a ward of the court. The court found Rebecca unable for some reason other than financial circumstances alone to care for, protect, train, or discipline Iris. The court found Christopher fit, able, and willing to care for, protect, train, and discipline Iris. The court ordered that Iris remain in the care and custody of Christopher under an order of protective supervision pursuant to section 2-24 of the Juvenile Court Act. The order was conditioned, in part, upon Christopher ensuring that Rebecca's visits with Iris be professionally supervised.

¶ 110   The trial court's dispositional findings were supported by the evidence. For these reasons, we affirm the court's dispositional order.

¶ 111                                   III. CONCLUSION

¶ 112   Accordingly, for the foregoing reasons, we affirm the trial court's adjudicatory and dispositional orders.

¶ 113   Affirmed.